647 F.2d 256
 25 Fair Empl.Prac.Cas. 1013,
25 Empl. Prac. Dec. P 31,714
ASSOCIATION AGAINST DISCRIMINATION IN EMPLOYMENT, INC.,
Roosevelt Johnson, Craig Kelly, Charles Herd, Robert Lewis,
William Cary, Charles R. Young, Herman Agosto, Harmin
Linares, Ismael Pomales, Salvador Perez, and on behalf of
all others similarly situated, Plaintiffs-Appellees-Cross-Appellants,
v.
CITY OF BRIDGEPORT, Nicholas Panuzio, Robert W. Weeks, Jr.,
Edward F. Daley, Julius Nobili, William G. Pjura, Frank J.
Deprinzio, Alan Cohen, BridgeportCivil Service Commission,
Charles E. Porzelt, Andrew Gottfried, Salvatore
S.Spadaccino,Charles J. Dougiello, John J. Hannon, John F.
Gleason, David Sullivan, WilliamD. Miklus, Albert Schwarz,
Bridgeport Board of Fire Commissioners, individuallyand in
their official capacities, Defendants-Appellants-Cross-Appellees,
and
Bridgeport Firefighters for Merit Employment, Inc., Joseph
Dicarlo, ThomasNaples, Philip Lynch, Bruno Bressie, Thomas
O'Connell, Frank G. Bender, andRobert B. Anderson,
Intervenors-Defendants-Appellants-Cross-Appellees.
 Nos. 549, 1103 and 1228, Dockets 79-7650, 79-7652 and 79-7709.
 United States Court of Appeals,
Second Circuit.
 Argued April 30, 1980.
Decided April 8, 1981.
Rehearing and Rehearing In Banc Denied May 29, 1981.
 
 David N. Rosen, New Haven, Conn. (Michael P. Koskoff, Bridgeport, Conn., on brief), for plaintiffs-appellees-cross-appellants.
 John J. McNamara, Bridgeport, Conn. (Raymond B. Rubens, Bridgeport, Conn., Bruce A. Nelson, John L. Beers, Steven B. Berlin, Wendy L. Tice-Wallner, Morrison & Foerster, San Francisco, Cal., on brief), for defendants-appellants-cross-appellees.
 J. Daniel Sagarin, Bridgeport, Conn. (Harrigan, Hurwitz, Sagarin & Rutkin, P. C., Bridgeport, Conn., on brief), for intervenors-defendants-appellants-cross-appellees.
 Steven H. Rosenbaum, Washington, D. C. (U. S. Dept. of Justice, Drew S. Days III, Asst. Atty. Gen., David L. Rose, Washington, D. C., on brief), for United States as amicus curiae.
 McGuiness & Williams, Washington, D. C. (Robert E. Williams, Douglas S. McDowell, Washington, D. C., on brief), for Equal Employment Advisory Council as amicus curiae.
 Before LUMBARD, VAN GRAAFEILAND and KEARSE, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 This employment discrimination suit, now before this Court for the second time, was commenced in 1975 in the United States District Court for the District of Connecticut on behalf of black and hispanic residents of Bridgeport, Connecticut, against the City of Bridgeport and other individuals responsible for hiring firefighters for the City of Bridgeport (hereinafter collectively the "City"). The plaintiffs contend that the City unlawfully discriminated in entry-level hiring practices for the Bridgeport Fire Department, in violation of Titles VI and VII of the Civil Rights Act of 1964 (the "Act"), 42 U.S.C. §§ 2000d to 2000d-4, and 2000e to 2000e-17 (1976), and the antidiscrimination provision of the State and Local Fiscal Assistance Act ("Revenue Sharing Act"), 31 U.S.C. § 1242(a) (1976). After trial, the district court ruled that a 1975 examination administered by the City violated Title VII. 454 F.Supp. 751 (D.Conn.1978). The court enjoined further use of the exam, and ordered various remedial measures, including requirements that only minority[1] candidates be hired until their number equaled the number of white candidates hired since 1975 and that thereafter one-half of all vacancies be filled by minority candidates until there were 125 minority firefighters in the force. 454 F.Supp. 758 (D.Conn.1978).
 
 
 2
 On appeal, this Court concluded that the opinions below provided an insufficient basis for review of the sensitive questions raised by "sweeping affirmative relief, including hiring quotas." 594 F.2d 306, 309 (1979) ("ADE v. Bridgeport"). Accordingly, the district court's order was vacated and the case remanded for further consideration. Following a limited hearing on remand, the district court reaffirmed its original determination that the City was liable under Title VII, determined that the City was also liable under Title VI and the Revenue Sharing Act, and modified in several respects the relief ordered. 479 F.Supp. 101 (D.Conn.1979.)
 
 
 3
 On this appeal the City and the intervening current firefighters challenge the findings of liability under Title VI and liability under Title VII prior to 1975, and they attack most aspects of the remedial order. Plaintiffs have cross-appealed, challenging two limited aspects of the relief granted. For the reasons below, we generally affirm the decision of the district court, but vacate the finding of liability under Title VI and remand portions of the remedial order for modification.
 
 I. FACTS AND PRIOR PROCEEDINGS
 
 4
 Since 1936, the City's process of selecting its firefighters has included the giving of a written examination. In 1972, having had only two minority firefighters since 1936, having recently been sued for employment discrimination in the police department, and perhaps recognizing the approaching applicability of Title VII to municipalities, Bridgeport joined ten other Connecticut cities in hiring a consulting firm to develop a new exam for firefighters. The resulting exam was administered by the City in 1975. In order to qualify for firefighter positions, candidates were required to achieve a score in or above the 75th percentile of those taking the exam; they were then ranked according to their scores. In addition, a 1975 candidate was required to pass medical and physical agility tests, be over the age of eighteen, be a high school graduate or have earned high school equivalency certification, have resided in the City for at least one year just prior to taking the written exam, and hold a valid Connecticut driver's license.
 
 
 5
 Of the 661 white candidates who took the 1975 exam, 184, or 27.8%, passed. Of the 110 minority candidates who took the exam, eight, or 7.3%, passed.
 
 A. The Complaint
 
 6
 The initial complaint in this action was filed on September 2, 1975, by the Association Against Discrimination in Employment and ten individual plaintiffs who are black or hispanic residents of Bridgeport, on behalf of themselves and all others similarly situated. The plaintiffs alleged that the City had engaged in a "policy and practice of discriminating on the basis of race, color and/or national origin against minority group members" and that minority group members "are currently being denied initial employment and promotion in the Bridgeport Fire Department." The original complaint attacked the 1975 test as well as the City's prior practices, asserting claims under 42 U.S.C. §§ 1981 and 1983 (1976), and Title VII; the complaint was amended several times, as plaintiffs withdrew the claims under §§ 1981 and 1983 and added allegations of violation of Title VI and the Revenue Sharing Act, and alleged the filing of charges with the Equal Employment Opportunity Commission ("EEOC"). Unless otherwise noted, references hereafter to the "complaint" are to the third amended complaint in its final form.
 
 
 7
 In July 1976, Bridgeport Firefighters for Merit Employment, Inc. ("BFME"), a non-profit organization, was permitted to intervene as a defendant and cross-claimant, representing "non-minority firefighters within the Bridgeport department of fire services." BFME's cross complaint sought relief from any injury which might be done to nonminority firefighters by the City as a result of any modification of the City's existing hiring or promotional practices.
 
 B. Interim Hiring from the 1975 List
 
 8
 Shortly after the intervention of BFME, plaintiffs learned of the City's plans to make immediate appointments from the list of eligible candidates generated by the 1975 exam, and moved for a preliminary injunction against such appointments. The motion came before Judge Newman, who issued an order, on consent of all parties, permitting defendants to "make at any time appointments to the Bridgeport Fire Department of a number of firefighters equal to one-half the number for which the city warrants there is and will remain an immediate need and adequate funding." The order further stated that "(i)n the event the Court should order a hiring plan, these appointments will be counted as part of such plan." Pursuant to this order 40 firefighters were hired commencing in October 1976.
 
 
 9
 In 1977 the City sought to hire additional firefighters from the 1975 list. On June 13, 1977, the parties agreed, before Judge Zampano, that the City could hire additional firefighters from that list under substantially the same conditions as those set forth in Judge Newman's order. Thereafter 44 additional firefighters were hired.
 
 
 10
 Of the 84 firefighters hired pursuant to the interim orders, 81 were white and three were minorities.
 
 C. The Trial Court's Initial Decision
 
 11
 In 1978, following a substantial period of discovery, an eleven-day trial with respect to liability was held before Judge Daly. The court found that the City had violated Title VII. It observed that although minorities comprised 41% of Bridgeport's population the Bridgeport Fire Department, 428 members strong, had only one minority firefighter prior to the 1975 exam. The court found that the 1975 exam "did little to alter this imbalance": only eight of the 192 candidates who passed it were members of minority groups, and the pass rate for nonminority candidates was more than three times that for minority candidates. The court concluded that these statistics left "no doubt that the firefighters exam had a disparate impact on the named plaintiffs and the class of persons they represent." 454 F.Supp. at 754.
 
 
 12
 As to the merits of the test itself, the court found that it was doubly flawed. First, the exam had no rational relationship to the skills needed in firefighting. The test was developed, by the consulting firm retained for that purpose, without compiling any list of critical work behaviors and with no effort to rank the rated skills in terms of their importance to the job.[2] 454 F.Supp. at 755-56. Indeed, in handing down his order on remedy, Judge Daly noted that the Bridgeport Fire Chief had testified at the remedy hearing "that there might be an inverse correlation between those who passed the exam and those who are most qualified to be firefighters." Id. at 759. For example, while the Fire Chief stated that superior physical ability and intelligence are the two most important attributes, the 1975 hiring process used simply a pass-fail physical agility test, and the 1975 written exam weighed negatively any high scores on comprehension questions, thus "penaliz(ing) those who indicated that they were 'inquiring, curious, analytic, exploring, intellectual, reflective, incisive, investigative, probing, logical, scrutinizing, theoretical, astute, rational (and) inquisitive.' " Id.[3] Ironically, the court noted that the 1975 exam "represented a decided improvement over some of the earlier civil service exams employed by Bridgeport." 454 F.Supp. at 757.
 
 
 13
 The second flaw in the 1976 exam lay in the City's selection of 12 as the minimum passing score, a choice that the court found "bore no relation to 'normal expectations of proficiency.' " Id.[4] (quoting 19 C.F.R. § 1607.6 (1977)). The court found that lowering the passing score from twelve to six would have significantly alleviated the discriminatory impact of the exam.
 
 
 14
 The court concluded that the use of the 1975 exam could not be continued, and it awarded a variety of relief to minority candidates for firefighter positions. Because it had found the 1975 exam not job related, the court began "with the premise that the firefighters exam administered in 1975 did not distinguish qualified from unqualified applicants." 454 F.Supp. at 759. Since testimony showed that the 84 firefighters hired while the case was pending were adequately performing their duties and since their scores on the non-job-related exam did not demonstrate that they were any better qualified than those who failed, the court found it "fair to assume that all of the applicants who are able to pass the same agility test and medical examination will be capable of performing at least as well as the eighty-four men already hired." Id.
 
 
 15
 With the goal of "remedying the disparate impact of the firefighters exam by placing those frustrated applicants on a parity with the eighty-four men who have been hired," 454 F.Supp. at 759-60, the court ordered the immediate hiring of "Blacks and Hispanics who filed applications with the civil service office for the 1975 firefighters exam and who pass both the agility test and the medical examination." These applicants were also awarded backpay and seniority retroactive to October 1976. Once the 1975 minority applicants were hired, the City would have been required to make all future selections from a pool of qualified minority candidates until the number of minority candidates hired since 1975 equaled the number of white candidates hired since that time, and then to hire one-half of all firefighters from the minority pool until the number of minority firefighters totaled 125.
 
 D. The First Appeal
 
 16
 Defendants appealed to this Court, attacking both the finding of liability and the remedy. They contended, inter alia, that their selection of an employment test was an administrative decision that could not be overturned if supported by substantial evidence, and that the relief ordered amounted to the imposition of a quota that was unconstitutional, unlawful under § 703(j) of Title VII, and unwarranted by the facts. Plaintiffs cross-appealed, arguing that the district court had improperly limited backpay to those minority candidates who had taken the exam in 1975 and were to be appointed pursuant to the court's order, rather than including minority candidates who had taken the exam in 1975 but no longer desired appointment or no longer met the prerequisites and minority individuals who had been deterred from applying by defendants' past discriminatory practices.
 
 
 17
 This Court recognized that "(n)o manner of legal argument can justify" the virtual absence of minorities on the force, 594 F.2d at 308, but found the district court's opinions trebly inadequate to permit resolution of the challenges to the relief ordered. First, it was not clear that the district court had considered any of this Court's recent opinions dealing with quotas. We offered the following guidance with respect to those opinions:Looking to the decisions of our own court, it is reasonably clear that for some of its members quota relief can constitutionally be justified only if necessary to redress 'a clear-cut pattern of long-continued and egregious racial discrimination,' and if the reverse discriminatory effects of the quota do not fall upon 'a small number of readily identifiable' non-minority persons. Kirkland v. New York State Department of Correctional Services (520 F.2d 420, 429 (2d Cir.), rehearing denied, 531 F.2d 5 (2d Cir. 1975), cert. denied, 429 U.S. 823 (97 S.Ct. 73, 50 L.Ed.2d 84) (1976)).
 
 
 18
 594 F.2d at 310. Thus we instructed the district court to consider the relevant authorities expressly and to make appropriate findings, answering such questions as (a) whether its ruling on liability was based on discrimination before or after 1972, and on what theories it relied, and (b) why the quota required the hiring of minorities in a ratio that exceeded their representation in the group of applicants who took the 1975 test.
 
 
 19
 Second, it was not apparent what effect the district court had given to the two pretrial orders that had permitted the City to hire 84 firefighters from the 1975 list. Various interpretations were possible. Plaintiffs contended, for example, that the parties had impliedly agreed that if the test were held invalid, the hiring of 84 blacks and hispanics could immediately be ordered. BFME, on the other hand, contended that plaintiffs had agreed to the interim orders in order "to avoid an early hearing and in exchange for guaranteed funding for positions which might, but not necessarily would, be assigned to minority group members." Id. at 312 (footnote omitted). The City contended that the interim orders immunized it from any backpay liability. Since the district court had not explicitly considered the implications of the interim orders, we instructed it to do so on remand.
 
 
 20
 Finally, we noted the district court's stated view that the disparate impact of the exam could have been significantly alleviated by lowering the passing score. While declining to express a view as to "whether an employer who selects a cut-off score and defends it until the test has been found not job-related can then avoid the implications of that finding by adjusting the passing score to a point where the disparate impact is arguably insignificant," 594 F.2d at 313 n.20, we directed the district court to explore, on remand, the possibility
 
 
 21
 that some plan which accepts the reduction of the passing mark to six and treats the list as a qualifying list without ranking, subject to passing physical and medical examinations, would, as an interim measure, afford substantial minority representation and be acceptable as part of an overall settlement that the parties may still discover to be the most sensible course of all.
 
 
 22
 Id. at 314.
 
 
 23
 II. PROCEEDINGS LEADING TO THE PRESENT APPEAL
 
 
 24
 A. Structuring of Issues for Consideration on Remand
 
 
 25
 On remand, the parties expressed varying views as to the proper scope of the new proceedings. BFME, apparently envisioning a completely new trial of all the issues in the case, served on plaintiffs requests for more than 180 admissions of "fact," ranging from the basic concept of civil service hiring, to the validation of the 1975 test,[5] to the state of employment discrimination law in this Circuit. Plaintiffs and the City set considerably narrower sights. The City stated that it wished to submit further evidence on three issues that it described as follows:
 
 
 26
 1. The effect on disparate impact if the passing score is reduced from 12 to 6 and differential adjustments are made.
 
 
 27
 2. Adopt a plan which accepts the score reduction and treats this list as a qualifying list without ranking, subject to passing physical and medical examinations, which would afford substantial minority representation on the Fire Department.
 
 
 28
 3. Whether the City has a long history of notorious discriminatory practices in its hiring policies?
 
 
 29
 Plaintiffs, expressly reserving their position that the City could not avoid liability "by manipulation of the passing score after having been found to have discriminated," stated that they had no objection to presentation of further evidence on the City's first and third issues, nor on the second to the extent that it simply reflected the City's position with respect to remedy. Plaintiffs proposed, in addition, to submit evidence with respect to the current manpower needs and vacancies within the fire department, and with respect to Title VI. As to the latter, plaintiffs stated as follows:
 
 
 30
 After the trial in this case the Supreme Court addressed issues relating to Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, et seq., issues which are raised in the pleadings in this case. The record is not clear with respect to the relevance of Title VI to this case, in that there is no evidence relating to receipt of federal funds by the City other than Revenue Sharing funds. The record should be developed on this issue, by having the record reflect the City's receipt of funds, in order to avoid the necessity for a remand at some future time.
 
 
 31
 In a prehearing order, the district court reviewed the directions given by this Court on the first appeal and determined that a broad-ranging evidentiary hearing was uncalled for. Directing that any additional evidence be limited to that suggested by this Court's opinion and that necessitated by the passage of time since the district court's original remedy order, Judge Daly ruled that the issues as to which supplementary evidence would be permitted were the effect of the interim hiring orders, the effect of lowering the passing score on the 1975 exam, and the present personnel needs of the fire department. Discovery on other issues was denied. The court stated that further findings with respect to the appropriateness of quota relief would be based on the prior record.
 
 
 32
 B. The Supplementary Presentations of Evidence
 
 
 33
 An evidentiary hearing was held, limited to the three issues specified by the district court. The defendants offered expert testimony as to various candidate selection methods by which the disparity in pass rates on the 1975 test could be eliminated, assuming the passing level were lowered from twelve to six.[6] Plaintiffs offered expert testimony to show that lowering the passing score from twelve to six would not eliminate the disparate impact of the exam because it would merely decrease the disparity in pass rates from 20.5 percentage points to 14.2 percentage points, still a highly significant statistical difference.[7] The defendants' expert conceded that merely lowering the test score, without also adopting one of the methods he espoused, would not eliminate the disparate impact of the exam.
 
 
 34
 Testimony on issues other than those specified in the court's prehearing order was rejected. Thus, when the defendants proffered the testimony of a statistician and a chart to show that the percentage of minorities in the Bridgeport labor market of persons over the age of 18 with a high school diploma would not exceed 18%, the court sustained plaintiffs' objections on the ground that this issue had been fully litigated at trial and the evidence was beyond the scope of the hearing. Similarly, when plaintiffs called the City's Comptroller to testify on the subject of the City's use of federal funds in the fire department, to support their Title VI claim, the court sustained the City's objection that such testimony would be outside the scope of the hearing. The court stated, after ascertaining that the City's budget was published, that judicial notice would be taken of the budget.
 
 
 35
 It does not appear that the entire published budget was ever presented to the court. Subsequent to the hearing, plaintiffs filed the affidavit of a paralegal employed by plaintiffs' counsel, annexing photocopies of four pages described as part of the City's "Public Employment Employee Roster." The affidavit stated that these pages showed that in 1971 and 1972, "some federal money," provided under the Emergency Employment Act, "was used by the City to hire personnel for the Fire Department."
 
 C. The Decision on Liability
 
 36
 Following the submission of such supplementary evidence as was allowed, the district court made detailed findings of fact and set forth its conclusions of law.
 
 
 37
 The court found that, even had there been no additional evidence of discrimination, the statistical evidence alone would have established a prima facie case of discriminatory impact. In 1975, when black and hispanic persons comprised approximately 41% of the labor force, the City's fire department had 427 whites, one hispanic, and no blacks. In its entire history prior to 1975, the City had employed only two minority firefighters, one of them hired in 1938. Following the institution of the present suit, the City had, pursuant to the two orders permitting interim hiring, hired 84 firefighters; 81 of them were white. The court noted that the City's hiring of minorities approached the " 'inexorable zero.' " 479 F.Supp. at 109 n.9, quoting International Brotherhood of Teamsters v. United States, 431 U.S. 324, 342 n.23, 97 S.Ct. 1843, 1858 n.23, 52 L.Ed.2d 396 (1977).
 
 
 38
 "Not surprisingly," the court found, the City had a strong reputation for discrimination in employment. Indeed, its "reputation for employment discrimination against black and hispanic persons was 'by far the worst' of all cities in Connecticut." 479 F.Supp. at 106. The court found that the City's reputation, as well as certain of its actions, described below, deterred minority persons from even applying for City employment: "This reputation created the attitude in the black community that '(i)f you're black, just don't apply because you won't get the job.' " Id.
 
 
 39
 As to the merits of the 1975 test, the court found again that it was not job related and that it had a disparate impact on minority candidates. The court expressly incorporated its original findings with respect to the invalidity of the test, see Part I. C. supra. In addition the court found that certain parts of the exam were significantly discriminatory against blacks, and that certain of the test score data were improperly used. If adjustments were made for the improperly used data, using the 1975 test as a predictor of job performance would be " 'about as good as tossing a coin.' " Id. at 110 n.10, quoting testimony of Dr. John Peck.
 
 
 40
 In answer to one of the questions posed by this Court on the first appeal, Judge Daly found that merely reducing the passing level on the 1975 exam from twelve to six would not spare the City liability for unlawful discrimination. First, the court concluded, on the basis of testimony from experts on both sides, that such a reduction would decrease, but not eliminate, the disparity between the pass rates of whites and minorities; and the resulting disparity would still prove discriminatory impact. The court also concluded that it would be inappropriate for the court to order hiring on the basis of, and to undertake administration of, an employment test that had been proven to have no relation to job skills. Finally, the court found that even if the disparate effects of the 1975 test could be eliminated by lowering the passing level, the City could not avoid liability for employment discrimination, because it had "engaged in a policy and practice of discrimination extending well beyond the 1975 exam." Id. at 109-10 n.10.
 
 
 41
 The court found that the City had made little or no effort to recruit minority persons for the fire department. Noting that, despite its awareness of its discriminatory policies and reputation, the City had not adopted any affirmative action program until it was forced to do so in order not to lose some $7 million in federal funds, the court found that "(n)o voluntary efforts have been made by the City to comply with its own affirmative action goals for the Fire Department." Id. at 113 n.12. The court found that "(a)bsolutely no attempts were made to recruit minority applicants" for fire department examinations prior to 1972, id. at 106, and that no significant recruiting efforts were made by the City thereafter. Id. at 107. The court found that the City's pre-1972 failure to recruit minority persons for the fire department was deliberate.
 
 
 42
 Indeed, the court found that the City had "engaged in a continuing pattern and practice of actively deterring minority persons who have sought to become firefighters." Id. at 104-05. For example, it found that, while a coalition of community minority groups, coordinated by a local official of the United States Labor Department, was attempting to recruit minority candidates for the fire department, the City probably impeded these efforts. The City Civil Service Commission's personnel director furnished the coalition with a notice of the 1975 examination, and stated that familiarity with fire department tools, knowledge of first aid and knowledge of the geography of Bridgeport would be covered on the test. The coalition then, in sessions open to anyone, regardless of race, gave applicants training in these subjects. But the subjects covered by the 1975 test bore no resemblance to these areas; there were no questions involving geography, or first aid, or the use of firefighting equipment. Id. at 107-08. The understandable reaction of the minority applicants who had studied these rather pertinent subjects, only to be confronted with a test that did not mention them, was, " '(t)he City has fooled us again.' " Id. at 108.
 
 
 43
 The court found that the City had also engaged in several acts of discrimination against individual minority candidates. Plaintiff Ismael Pomales, for example, took the 1975 exam and passed it. However, he did not receive any notification that he had passed until he was informed that his name was being removed from the eligible list because he had not appeared for the physical agility test that those who passed the written exam were required to take. Other candidates were prevented from even taking the written test. One such candidate, class member Elias Castro, an hispanic with four years' experience as a firefighter in the United States Air Force, attempted to file his application with the Civil Service Commission in the middle of the afternoon on the last day for filing applications. He was told that it was too late. He was not allowed to speak to the superior of the person who told him it was too late, and he was not informed of any means by which he could appeal or lodge an official complaint. He did not get to take the 1975 exam. Another candidate, plaintiff Harmin Linares, filed his application before the deadline and was told that a notice would be mailed to him stating the date and time of the exam. He never received such a notice, and he did not get to take the exam.
 
 
 44
 Finally, the court found that the City's discrimination against minorities was of long duration. It reviewed the written firefighter exams that the City had given in 1965, 1968, and 1971. It found that none of these tests was job related and that all had had a disparate impact on minority applicants. For all these pre-1975 tests combined, those identified as nonminority candidates[8] had passed at the rate of better than one out of every three; of eighteen identified minority applicants, only one had passed. Id. at 108 n.9.
 
 
 45
 Thus, the court concluded that the City had "engag(ed) in a policy and practice of discrimination against black and hispanic persons relative to entry-level hiring in the Bridgeport Fire Department," id. at 111; see id. at 111-12; and that its pattern of discrimination was " 'clear-cut (,) long-continued and egregious.' " Id. at 112.
 
 
 46
 On the basis of these findings the court concluded that the City had violated Title VII, which prohibits discrimination in employment on the basis of race. Noting that the Title VII had not become applicable to municipalities until March 24, 1972, the court found that the combination of the statistical evidence, the City's use after that date of the results of the discriminatory examination held in 1971, and the City's policy and history of discrimination, including its deliberate failure to recruit minority applicants, compelled the conclusion that the City's violation of Title VII dated back to March 24, 1972.
 
 
 47
 Relying on many of the above findings, the court concluded also that the City's discriminatory policies and practices violated Title VI, dating back to January 1, 1971. Stating that Title VI prohibits such discrimination in " 'any program or activity receiving Federal financial assistance,' " id. at 111, quoting 42 U.S.C. § 2000d (1976), the court held that the City's receipt of such funds had been adequately proven.
 
 
 48
 Finally, the district court found that the City had received revenue sharing funds in every year since 1973, and that it had expended these funds, in part, for the operation of its Fire Department. The court concluded that the City's discriminatory practices had therefore violated the Revenue Sharing Act since January 1, 1973.
 
 D. The Remedy
 
 49
 In light of its expanded findings and conclusions, the district court fashioned a new remedial order, which we set forth in pertinent part in the margin.[9] The order banned any further use of the 1971 and 1975 exams, set immediate minority hiring goals for the City, required the active recruitment of minority firefighters and the hiring of firefighters on a nondiscriminatory basis after the immediate goals were met, and awarded backpay and seniority relief to victims of the City's discrimination.
 
 
 50
 After reviewing certain of this Court's decisions in employment discrimination cases, the court concluded that the City's long history of egregious race discrimination warranted the issuance of a race-conscious hiring order, and that the court would be shirking its duty were it not to order affirmative relief to remedy past effects of discrimination. The court stated that its own aims were to grant redress to the victims of discrimination, to prevent future discrimination, and to persuade potential minority candidates that future applications for employment in the Bridgeport fire department would not automatically be rejected. The court expressly declined, however, to impose a hiring quota, which it defined as an order requiring the relatively permanent use of a specified hiring ratio. Rather, the court determined to set hiring goals for the City, which would lapse when the specified number of minority offers had been made, concluding that the imposition of such goals was "the only effective means of remedying past discrimination." Id. at 114. The court elaborated as follows:
 
 
 51
 (T)his Court is of the opinion that merely ordering nondiscriminatory hiring in the future, even coupled with the requirement that the City actively recruit minority candidates, would be inadequate either to remedy past discrimination or "to assure prospective minority candidates that applying is no longer futile." Association Against Discrimination in Employment v. City of Bridgeport, supra, 594 F.2d at 311 n.13. "The effects of past violation(s) of the minority's rights cannot be eliminated merely by prohibiting future discrimination, since this would be illusory and inadequate as a remedy. Affirmative action is essential." Rios v. Enterprise Association Steamfitters Local 638, (501 F.2d 622, 631 (2d Cir. 1974)). 14
 
 
 52
 Id. at 113-14.
 
 
 53
 In setting the hiring goals for the City, the court looked to the period during which violations had been found and to the ratio between Bridgeport's minorities and nonminorities. On the basis of its ruling that the City's violations of Title VI dated back to January 1, 1971, the court selected the period starting on that date as its time frame. Within that period, the court observed that the City had hired 152 white firefighters, one hispanic firefighter, and three black firefighters. Having noted at the outset of its opinion that black and hispanic persons in 1975 comprised approximately 41% of Bridgeport's labor force, the court observed that "(t)he hiring of an additional 102 minority persons would create a situation in which the percentage of minority firefighters hired since January 1, 1971 roughly would equal the percentage of minority persons in the population of the City." Id. at 115 (footnote omitted).[10]
 
 
 54
 The court therefore ordered the City to compile a list of 102 persons to whom firefighter positions are to be offered.[11] The list is to be comprised, first, of those minority individuals still seeking to be firefighters who filed applications for either the 1971 or the 1975 exam and who can pass the City's agility test and medical examination; if there are fewer than 102 such persons, the list is to include minority persons who can prove to a special master that they were deterred by the City's discriminatory practices from applying to take either the 1971 or the 1975 exam, and who can pass the agility test and medical exam; and finally, if the total number of applicants and deterred would-be applicants is less than 102, additional minority persons, identified by a method to be devised by the City with the approval of the court, are to be added until the total reaches 102.[12]
 
 
 55
 The order requires the City, as quickly as possible within the limits of its ability to train new firefighters, to offer the 102 persons on the list active employment in the fire department and prohibits it from hiring any other individuals as firefighters until all of the persons on the list have been offered such employment.
 
 
 56
 In addition, the court ordered the City to compile a list of up to 102 persons to be awarded backpay, comprised, first, of persons who were applicants or deterred would-be applicants for the 1971 or 1975 exam whose names are placed on the list of persons to whom employment must be offered; if there are fewer than 102 such persons, the list is to include minority persons who applied to take the 1971 or 1975 test, but whose names are not on the list of persons to be offered positions, providing they prove to the special master by a preponderance of the evidence that they met the City's age, residency, driver's license, education, agility and medical requirements on the date of the exam for which they applied; and finally, if there are fewer than 102 persons in those two groups, the list is to include minority persons not on the list of those to be offered positions, who prove to the special master by a preponderance of the evidence that but for the City's discriminatory practices they would have applied to take either the 1971 or 1975 exam, and that on the date of such exam they met the city's age, residency, driver's license, education, agility and medical requirements. To the extent that all of these groups combined yield fewer than 102 persons, the remainder of the backpay list is to remain vacant. For those who took or were deterred from taking the 1971 exam, backpay was awarded for the period beginning in October 1973, i. e., two years prior to the filing of the first complaint with EEOC; for individuals who took or were deterred from taking the 1975 exam, backpay was awarded for the period beginning in October 1976, the date the first firefighter was hired from the 1975 list.
 
 
 57
 In recognition of the seniority loss suffered by the victims of the City's discrimination, the court prohibited the City from giving any promotional examinations to firefighters hired pursuant to the 1971 or 1975 exams until all new minority firefighters who took or were deterred from taking the 1971 or 1975 exams have become qualified to take the promotional examinations. The City was not prohibited from reducing its time-in-grade requirements for promotional exams so as to advance the time at which the new hirees would become eligible, or from filling any promotional vacancies on an "acting or provisional" basis, so long as any such acting or provisional supervisors were not given any preference in the selection of permanent supervisors.[13]
 
 E. Issues on This Appeal
 
 58
 On appeal, defendants do not contest the district court's conclusion that the City is liable for race discrimination under the Revenue Sharing Act dating back to January 1, 1973,[14] nor do they contest the conclusion that the 1975 exam was unlawful under Title VII. They contend, however, with respect to both Title VI and Title VII, that the district court erred in holding the City liable for discrimination prior to 1975. In addition, defendants challenge various aspects of the remedy, arguing that the remedy constitutes an impermissible hiring quota, that the numerical hiring order is overbroad and requires the City to hire unqualified individuals, that the promotional freeze places an undue burden on a small, readily identifiable group of nonminority employees, and that the backpay relief is overinclusive and insufficiently tailored to the alleged violations.
 
 
 59
 The plaintiffs have cross-appealed from two aspects of the relief ordered. They contend that the court erred in placing on the minority candidates the burden of proving that they met the City's nondiscriminatory employment requirements in order to receive backpay, and they contend that the district court should have awarded constructive seniority for job placement, benefits, and other purposes, to persons hired pursuant to the order.
 
 
 60
 As to liability, we affirm the holding that the City has violated Title VII since 1972, but vacate the district court's ruling that the City violated Title VI. As to remedy, we affirm the district court's general remedial plan, but remand for modification as to the number of minority persons to whom employment must be offered and as to various aspects of the backpay and seniority awards.
 
 III. LIABILITY UNDER TITLE VII
 
 61
 We turn first to defendants' contention that the district court erred in finding the City liable for Title VII violations dating back to March 24, 1972, the date on which Title VII became applicable to the City. Defendants do not contend here that the 1975 exam or the 1971 exam was job related or that the impact of either exam was not discriminatory. Rather they argue principally that it is not permissible to hold the City liable under Title VII for hiring from an eligibility list based on a pre-Title VII test, and that the Title VII claims based on hiring pursuant to the 1971 exam were not timely filed under § 706 of the Act.[15] Neither contention has merit.
 
 
 62
 A. Liability for Post-Title VII Hiring Based on the 1971 Exam
 
 
 63
 Defendants contend that the City cannot be held liable for any hiring pursuant to the list generated by its 1971 firefighters exam because that exam predated the applicability of Title VII to the City, and because its hiring from the 1971 exam was therefore pursuant to a "bona fide merit system," which is made lawful by § 703(h) of the Act. Neither precedent nor reason supports these contentions.
 
 
 64
 Section 703(a) of the Act makes unlawful an employer's failure or refusal to hire an individual on the basis of race. When it was enacted in 1964, this provision did not apply to municipalities. The provision became applicable to the City on March 24, 1972, by the passage of Pub.L. 92-261, § 2(1), 86 Stat. 103, which simply broadened the definitional provisions so as to make Title VII applicable to municipalities and certain other entities not previously covered. Nothing in the broadened definition suggested that a continued application of past discriminatory standards was permissible; clearly the intention was to the contrary. Thus, in Guardians Association v. Civil Service Commission, 633 F.2d 232 (2d Cir. 1980) ("Guardians III "),[16] we categorically rejected the notion that a municipal employer who held a discriminatory exam prior to March 24, 1972, could lawfully continue after that date to invoke the results of the discriminatory exam to make employment appointments. We observed that to conclude otherwise would permit an employer, "with impunity, (to) refuse to hire in a timely manner hundreds of minority applicants, solely because of performance on an invalid test, years after Title VII explicitly forbade the use of testing results to discriminate in hiring." Id. at 252 (emphasis in original).
 
 
 65
 Nor does § 703(h) of the Act legitimate defendants' post-Title VII hiring. That section provides in pertinent part as follows:
 
 
 66
 Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin.
 
 
 67
 42 U.S.C. § 2000e-2(h) (emphasis added). The City seeks to characterize its 1971 exam as a "bona fide merit system," in order to perpetuate its ability to use that test's results without violating Title VII. The district court, however, found that the 1971 exam was not job related and that it had a discriminatory impact findings that defendants do not challenge on this appeal. Thus, bypassing the question whether the term "merit system" even applies to hiring decisions, as contrasted with post-hiring decisions, see Guardians III, supra, 633 F.2d at 251-52, we reject the City's attempt to immunize its post-Act hiring by reference to § 703(h) for two reasons. First, since the 1971 test was "used" to discriminate against minorities, it is expressly excluded from § 703(h). More fundamentally, it would defy reason to characterize as a "bona fide merit system" a test that does not measure the fitness of those who take it for the positions to be filled according to its results. See id. at 252 ("(A) hiring system that ranks applicants according to their performance on discriminatory examinations cannot claim the status of a 'bona fide merit system' within the meaning of the statute.") Thus, defendants' argument, like that of the defendants in Guardians III, is not supported by the decision of the Supreme Court in International Brotherhood of Teamsters v. United States :
 
 
 68
 Unlike the seniority system in Teamsters, the merit system in the instant case does not measure what it purports to measure. The failing of the department's hiring system is therefore not that it perpetuates the effects of past discrimination, but rather that it perpetuates discrimination. It is one thing to utilize a system that locks in the effects of past discriminatory hiring decisions; it is a very different thing to lock in a discriminatory method of making hiring decisions Nothing in Teamsters implies that by labelling a non-job-related system of employee selection a 'merit' system, an employer can avoid the command of Title VII that it henceforth select its workforce in a non-discriminatory fashion.
 
 
 69
 Guardians III, supra, 633 F.2d at 253 (emphasis in original).
 
 
 70
 Accordingly, we conclude that the City could be held liable under Title VII for its post-Act appointments based on the 1971 test.
 
 B. The 300-Day Limitation
 
 71
 Defendants' other principal challenge to the district court's ruling under Title VII is based on the statute of limitations established by § 706(e) of the Act. That section provides that in order to maintain a suit under Title VII, a plaintiff must have filed a charge of discrimination with EEOC within 300 days of the alleged discriminatory act.[17] 42 U.S.C. § 2000e-5(e) (1976). See, e. g., United Air Lines, Inc. v. Evans, 431 U.S. 553, 555 n.4, 97 S.Ct. 1885, 1887 n.4, 52 L.Ed.2d 571 (1977); Cates v. Trans World Airlines, Inc., 561 F.2d 1064 (2d Cir. 1977). The City's last hirings based on the 1971 exam occurred on May 2, 1973, and there were no further hirings until after 1975. Plaintiffs' first EEOC charge pertaining to defendants' hiring practices was filed in October 1975. Defendants argue, therefore, that insofar as plaintiffs' claims relate to the 1973 and earlier hirings, they are barred by the 300-day period of limitations. This contention takes an impermissibly myopic view of the nature of the City's unlawful conduct.
 
 
 72
 As a general matter, the mere continuation of a discriminatory act's effects, when the act itself occurred prior to the pertinent limitations period, is not sufficient to support recovery under Title VII. United Air Lines, Inc. v. Evans, supra, 431 U.S. at 558, 97 S.Ct. at 1889. See also Delaware State College v. Ricks, -- U.S. --, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). The act that constitutes the violation must be "still fresh" within the statutory period. Egelston v. State University College, 535 F.2d 752, 755 (2d Cir. 1976). Thus, had the 1971 exam and the hiring on the basis of that exam been isolated acts of discrimination, defendants' statute of limitations argument would be well taken, even though the effects of that past discrimination were still being felt by reason of the resulting racial makeup of the fire department.
 
 
 73
 Where, however, the defendant has engaged in a continuous policy of discrimination, acts in furtherance of that policy are not viewed in isolation. In such circumstances if the charge has been filed no later than 300 days after the last act by the defendant pursuant to its policy, the plaintiff may recover for earlier acts of discrimination as well. See Guardians III, supra, 633 F.2d at 249; Acha v. Beame, 570 F.2d 57, 65 (2d Cir. 1978); see also Smith v. American President Lines, Ltd., 571 F.2d 102 (2d Cir. 1978). In Acha v. Beame, we stated this principle as follows:
 
 
 74
 To succeed at trial, the appellants must be able to demonstrate a Title VII violation occurring after the effective date of the Act and within the period of the statute of limitations, or 300 day charge-filing period. But such a violation is not limited to hiring violations per se.
 
 
 75
 A continuously maintained illegal employment policy may be the subject of a valid complaint until a specified number of days after the last occurrence of an instance of that policy Furthermore, where an illegal policy is so maintained, relief for injuries sustained even before the beginning of the limitations period is appropriate.
 
 
 76
 570 F.2d at 65 (emphasis in original; citations omitted).
 
 
 77
 There can be no doubt that the continuous-policy principle governs the present case. The district court made express findings as to several discriminatory acts by the City that occurred within 300 days of October 1975. These included the giving of the 1975 exam that was not job related and had discriminatory impact, and the individual acts of discrimination against several minority candidates who sought to take that exam in 1975. In addition, the court found that the City had "engaged in a continuing pattern and practice of post-Title VII discrimination against black and hispanic persons," 479 F.Supp. at 104; that it had "a continuing policy and practice of discriminating against black and hispanic persons," id. at 111-12; and that it had "engaged in a 'clear-cut pattern of long-continued and egregious racial discrimination,' " id. at 112. The court concluded as follows: "This Court also finds that the discrimination has been 'long-continued' whether one examines the entire history of the City's hiring of firefighters or only its post-Act conduct." Id. at 113.
 
 
 78
 In light of these findings, which are not clearly erroneous, the City's 1975 discriminatory acts cannot be divorced from its earlier acts or its overall history. We conclude that all of plaintiffs' Title VII claims are timely, and we affirm the ruling of the district court that the City violated Title VII from March 24, 1972, by making appointments after that date that had discriminatory impact, based on its discriminatory 1971 test.
 
 IV. LIABILITY UNDER TITLE VI
 
 79
 The City has made essentially a threefold challenge to the district court's finding of liability under Title VI. It contends that it never had notice of, or an opportunity to litigate, the Title VI issues in the district court, that such claims are barred by the applicable statute of limitations or by laches, and that in any event, plaintiffs failed to prove a violation of that Title. Since we find merit in the last of these contentions we need not deal with the issue of timeliness, and we touch on the notice contention only in order to place in perspective the failure of proof.
 
 
 80
 The complaint filed by plaintiffs clearly raised issues under Title VI. Paragraph 6(b) stated as follows:
 
 
 81
 Bridgeport has received in the past and will receive in the future federal financial assistance including revenue sharing funds. It has spent a portion of these funds and intends to continue to spend a portion of such funds received in the future in the area of public safety, including the Fire Department.
 
 And paragraph 17 alleged:
 
 82
 Defendants (sic ) discriminatory practices violate the plaintiffs' rights not to be excluded from participation in, denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance, on account of race, color, or national origin, guaranteed by Title VI of the Civil Rights Act of 1964, 42 U.S.C. Section 2000d.
 
 
 83
 The City admitted the allegations of paragraph 6(b), and denied paragraph 17.
 
 
 84
 Much of the evidence presented by plaintiffs at trial related to the City's discriminatory practices between 1964, when Title VI took effect, and 1972 when Title VII became applicable to municipalities. For example, the record included the firefighters examinations given in 1965, 1968 and 1971, with data as to the numbers of minority and nonminority applicants who took and who passed those exams. This evidence was relevant not only as background for the Title VII claim, but also as proof of the Title VI claim. The latter relevance does not seem to have been entirely lost on the defendants; the City's post-trial memorandum began with the statement that the plaintiffs asserted claims under both Title VII and Title VI. We conclude that the defendants had more than adequate notice and opportunity to contest the Title VI claims at the initial trial in this case, and that the district court was entitled toconsider these claims after the remand from this Court.[18]
 
 
 85
 As the record stands, however, we do not find that plaintiffs proved all of the elements of their Title VI claim.[19] Title VI, § 601 of the Civil Rights Act, states:
 
 
 86
 No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
 
 
 87
 42 U.S.C. § 2000d (1976). Section 602 of the Act imposes on agencies "empowered to extend Federal financial assistance to any program or activity" a duty to effectuate the provisions of the Title by issuing appropriate rules and regulations. 42 U.S.C. § 2000d-1. The enforcement power of the agencies under § 602, however, is limited by § 604 as follows:
 
 
 88
 Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment.
 
 
 89
 42 U.S.C. § 2000d-3. This section in effect requires a logical nexus between the use of federal funds and the practice toward which agency action is directed. Although on its face § 604 limits the circumstances under which action can be taken by an agency, plaintiffs have not argued that the provision is applicable only to agencies and not to private actions. Both plaintiffs' brief and the amicus brief of the government appear to assume that the "primary objective to provide employment" limitation applies to private rights of action as well. We agree. We see no indication that Congress would not have intended that the logical nexus requirement exist with respect to private actions as well as agency action. Thus, for a claimant to recover under Title VI against an employer for discriminatory employment practices, a threshold requirement is that the employer be the recipient of federal funds aimed primarily at providing employment. See Carmi v. Metropolitan St. Louis Sewer Dist., 620 F.2d 672, 674-75 (8th Cir.), cert. denied, -- U.S. --, 101 S.Ct. 249, 66 L.Ed.2d 117 (1980); Trageser v. Libbie Rehabilitation Center, Inc., 590 F.2d 87, 88-89 (4th Cir. 1978), cert. denied, 442 U.S. 947, 99 S.Ct. 2895, 61 L.Ed.2d 318 (1979).
 
 
 90
 The district court's findings with respect to Title VI did not touch on this requirement. The court stated simply as follows:
 
 
 91
 Defendants, in their answer, have admitted that federal funds have been received by the City and expended in the Fire Department. Plaintiffs have proven that such funds were received and expended in the Fire Department in each year between 1971 and 1977.
 
 
 92
 479 F.Supp. at 111. There was no finding that the funds were aimed primarily at providing employment. Thus, the findings do not adequately support the ruling on liability.
 
 
 93
 Nor would a finding as to the primary purpose of the federal funds have been supported by the properly received evidence of record. The complaint contained no express allegation as to the primary purpose of such funds, and hence there was no pleaded admission as to this element. Further, it appears that no evidence as to the purpose of the federal funds was introduced at the earlier stages of this case. Prior to the evidentiary hearing on remand, plaintiffs apparently recognized that the record was deficient in this respect, stating as follows:
 
 
 94
 The record is not clear with respect to the relevance of Title VI to this case, in that there is no evidence relating to receipt of federal funds by the City other than Revenue Sharing funds.
 
 
 95
 Plaintiffs therefore requested that the court accept evidence relating to Title VI at the hearing on remand. The district court, however, denied plaintiff's request. Its prehearing order limited the permissible evidence to other issues, and when plaintiffs nevertheless sought at the hearing to elicit testimony from the City's Comptroller on the subject of the City's use of federal funds, the court sustained the City's objection and dismissed the witness. The plaintiffs do not challenge this exclusion by the district court; to the contrary, they properly concede that "the scope of additional evidence, if any, was within the trial judge's discretion, which he did not abuse." (Appellees' Brief on Appeal at 21.)
 
 
 96
 Plaintiffs contend, however, that the record adequately reflects the use of federal funds under the Emergency Employment Act[20] for the purpose of employment in the City's fire department, because the district court stated that it would take judicial notice of the City's budget. While we reject the City's contention that the district court could not properly take judicial notice of the budget, we cannot see that any materials properly the subject of judicial notice provided the information that was required. Rule 201(b) of the Federal Rules of Evidence allows a court to take judicial notice of a fact that is not subject to reasonable dispute because it is either
 
 
 97
 (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.
 
 
 98
 A municipality's published budget could qualify as a source of information whose accuracy cannot reasonably be questioned. What was presented to the court here, however, was a few photocopied pages of the City's "Public Employment Employee Roster," which did not readily reveal the primary purpose of federal funds received by the City.
 
 
 99
 These pages merely listed names and addresses of individuals, together, apparently, with various City departments, and dates, and an assortment of other numbers that we find altogether cryptic. Nowhere on any of the photocopied pages is there any mention of the Emergency Employment Act, or any other indication that what is there reflected is federal funding primarily for employment.
 
 
 100
 The characterization of these pages as reflecting the receipt of federal funds for employment purposes comes strictly from the affidavit to which they were attached. This affidavit, submitted by a paralegal employed by plaintiffs' counsel, stated in pertinent part as follows:
 
 
 101
 IV. My examination revealed that indeed, at least during the years 1971 and 1972, some federal money was used by the City to hire personnel for the Fire Department. This money was provided to the City through the Emergency Employment Act of 1971.
 
 
 102
 V. The hiring of Fire Department personnel with Emergency Employment Act money was recorded in the "Public Employment Employee Roster" for the years 1971 and 1972. Photocopies of relevant pages of this roster along with my own added notations are attached.
 
 
 103
 Such an affidavit, of course, is not a source whose accuracy is beyond reasonable question, and the facts recited therein could not properly have been judicially noticed.[21]
 
 
 104
 We conclude that the affidavit could not, and the photocopies did not, supply the evidence required to support plaintiffs' Title VI claim. We therefore vacate the court's ruling that the City violated Title VI.
 
 V. THE REMEDIAL ORDER
 
 105
 The district court's remedial order grants what may be viewed as three classes of relief: (1) compliance relief, i. e., that designed to assure future compliance with Title VII; (2) affirmative relief, or that designed to remedy the effects of past discrimination; and (3) compensatory relief, that which is designed to "make whole" the victims of past discrimination. The last two categories may overlap to some extent, although their intended functions differ. The first two categories differ principally as follows:
 
 
 106
 Compliance involves restricting the use of an invalid exam, specifying procedures and standards for a new valid selection procedure, and authorizing interim hiring that does not have a disparate racial impact. Affirmative relief involves interim hiring at any ratio greater than what is necessary just to avoid a disparate racial impact and any required long-term hiring targets or ratios.
 
 
 107
 Guardians Ass'n v. Civil Service Comm'n, 630 F.2d 79, 108 (2d Cir. 1980) ("Guardians IV ") (footnotes omitted).
 
 
 108
 The principal element of compliance relief granted by the district court is the injunction against any further use of the 1971 and 1975 written exams. In addition, following the City's compliance with the immediate affirmative relief granted, the City is ordered actively to recruit minority persons to compete for firefighter positions and to hire on a nondiscriminatory basis. These portions of the order are not challenged by the defendants.
 
 
 109
 The principal affirmative relief provided by the order is the requirement that the City compile a list of 102 minority candidates to whom firefighter positions must be offered before anyone else may be hired. This requirement provides compensatory relief as well, since priority is given, in the compilation of the list, to actual victims of the City's discrimination. Additional compensatory relief is given in the form of a suspension of promotional examinations until all the new minority firefighters who were victims of the City's discrimination become eligible to take them, and the awarding of backpay to up to 102 persons who were victims of the City's discrimination. The defendants attack all phases of the provisions granting affirmative and compensatory relief. The plaintiffs challenge limited aspects of the district court's order with respect to seniority and backpay.
 
 
 110
 The primary purposes of Title VII are to prevent discrimination and achieve equal employment opportunity in the future, see International Brotherhood of Teamsters v. United States, supra, 431 U.S. at 364, 97 S.Ct. at 1869; Albemarle Paper Co. v. Moody, 422 U.S. 405, 417 (1975); Griggs v. Duke Power Co., supra, 401 U.S. at 429-30, 91 S.Ct. at 852-853, and to make whole the victims of past discrimination, see, e. g., International Brotherhood of Teamsters v. United States, supra; Franks v. Bowman Transp. Co., 424 U.S. 747, 764, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444 (1976); Albemarle Paper Co. v. Moody, supra, 422 U.S. at 418, 95 S.Ct. at 2372. Our evaluation of the district court's order must begin with the recognition that "(o)nce a violation of Title VII is established, the district court possesses broad power as a court of equity to remedy the vestiges of past discriminatory practices." Rios v. Enterprise Ass'n Steamfitters Local 638, supra, 501 F.2d at 629. See also EEOC v. Local 638, 565 F.2d 31, 34 (2d Cir. 1977); Vulcan Society of the New York City Fire Dep't, Inc. v. Civil Service Commission, 490 F.2d 387, 399 (2d Cir. 1973); Bridgeport Guardians, Inc. v. Members of the Bridgeport Civil Service Comm'n, 482 F.2d 1333, 1340 (2d Cir. 1973), cert. denied, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975). Our function is not to exercise our own discretion, but to determine, in light of the purposes of the Act, whether the district court judge has abused his. Cf. Albemarle Paper Co. v. Moody, supra, 422 U.S. at 421-22, 95 S.Ct. at 2373-2374.
 
 
 111
 Because we have vacated the district court's ruling that the City violated Title VI, we find that the number of persons to whom positions must be offered and to whom backpay must be paid should be reduced. In addition, we find that certain aspects of the seniority and backpay awards should be modified. In all other respects, however, we conclude that the remedial order was a proper exercise of the district court's discretion.
 
 A. The Propriety of Affirmative Relief
 
 112
 Defendants' attack on the nature of the affirmative relief, as distinct from the size of the list, asserts principally that the order imposes a quota in violation of § 703(j) of the Act and that it impermissibly discriminates against nonminority individuals. Analysis of the order, however, reveals that the court has not imposed a quota; and the record in this case persuades us that the type of relief ordered is fully justified.
 
 
 113
 Despite the considerable deference to which a district court's remedial design is entitled, this Court has subjected numerical hiring orders to particularly close scrutiny. As we noted in the prior appeal in this case, cases involving hiring quotas "have been the occasion for some strong differences of opinion" among members of this Court. ADE v. Bridgeport, supra, 594 F.2d at 310. Compare Fullilove v. Kreps, 584 F.2d 600, 606-7 (2d Cir. 1978), aff'd sub nom. Fullilove v. Klutznick, -- U.S. --, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980); Chance v. Board of Examiners, 534 F.2d 993, 1002-03 (2d Cir. 1976) (Oakes, J., dissenting), cert. denied, 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977); Kirkland v. New York State Dep't of Correctional Services, 531 F.2d 5, 8 (2d Cir. 1975) (Mansfield, J., dissenting from denial of rehearing en banc); and Patterson v. Newspaper & Mail Deliverers' Union, 514 F.2d 767 (2d Cir. 1975), cert. denied, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976), with Chance v. Board of Examiners, supra (majority opinion); Patterson v. Newspaper & Mail Deliverers' Union, supra, 514 F.2d at 776 (Feinberg, J., concurring); Rios v. Enterprise Ass'n Steamfitters Local 638, supra, 501 F.2d at 634-39 (Hays, J., dissenting). The Supreme Court's recent opinions in Regents of the University of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) and United Steelworkers of America v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), provide no clear guidance as to how these differences should be resolved. Bakke, which revealed "strong differences of opinion" in the Supreme Court as well, did not involve a temporary quota or goal imposed as a specific remedy to an adjudicated violation of Title VII. Cf. 438 U.S. at 300-02, 98 S.Ct. at 2753-2754 (opinion of Powell, J.); see also Fullilove v. Klutznick, supra, 100 S.Ct. at 2784-85 (Powell, J., concurring). And in Weber, which involved an affirmative action plan that a private employer had adopted voluntarily, the Court specifically excluded from the scope of its inquiry "what Title VII requires or what a court might order to remedy a past proved violation of the (Civil Rights) Act." 443 U.S. at 200, 99 S.Ct. at 2726.
 
 
 114
 Despite the differences of opinion in the Supreme Court and in our own Court, several guiding principles emerge from the cases. First, since a primary purpose of Title VII is to make whole the past victims of discrimination, "(i) nitial consideration should be given to relief for the plaintiffs and those similarly situated," that is, to identifiable victims of the employer's discriminatory actions. Guardians IV, supra, 630 F.2d at 108. Section 706(g) of the Act makes it clear that such make-whole relief may include an order requiring the hiring of past discriminatees. 42 U.S.C. § 2000e5(g).[22] In addition, the court may seek to eradicate the discriminatory effects of proven Title VII violations, see, e. g., Rios v. Enterprise Ass'n Steamfitters Local 638, supra, 501 F.2d at 633 ("elimination of discriminatory effects is permissible"), by eliminating the disparate impact of a discriminatory exam. See Guardians IV, supra, 630 F.2d at 108.
 
 
 115
 Second, the remedy for a proven violation of anti-discrimination laws need not be "color blind" but "may in the appropriate case include a racial or ethnic factor." Fullilove v. Klutznick, supra, 100 S.Ct. at 2777 (opinion of Burger, C. J.). Section 706(g) specifically provides that upon finding a violation a court may "order such affirmative action as may be appropriate," 42 U.S.C. § 2000e-5(g), and § 703(j) of the Act does not bar race-conscious relief. That section provides, in pertinent part, as follows:
 
 
 116
 Nothing contained in this subchapter shall be interpreted to require any employer to grant preferential treatment to any individual or to any group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race in comparison with the total number or percentage of persons of such race in any community, State, section, or other area, or in the available work force in any community, State, section, or other area.
 
 
 117
 42 U.S.C. § 2000e-2(j). As this Court has stated many times, what § 703(j) proscribes is racial preference where racial imbalance is not related to discrimination; but it does not proscribe imposition of a racial goal as an exercise of remedial authority under § 706(g) to correct an imbalance that has resulted from discrimination. See, e. g., EEOC v. Local 638, supra, 532 F.2d at 827-28; Rios v. Enterprise Ass'n Steamfitters Local 638, supra, 501 F.2d at 630-31; United States v. Wood, Wire and Metal Lathers Int'l Union, Local 46, 471 F.2d 408, 412-13 (2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973). And while some members of this Court have expressed reservations as to the proper interpretation of § 703(j), see e. g., EEOC v. Local 638, supra, 532 F.2d at 834 (Feinberg, J., concurring); Rios v. Enterprise Ass'n Steamfitters Local 638, supra, 501 F.2d at 636-37 (Hays, J., dissenting), they have not, to our knowledge, suggested that it bars a provision that not only gives affirmative relief but simultaneously awards compensatory relief by requiring the hiring of the identifiable victims of discriminatory employment practices.
 
 
 118
 Balanced against the broad equitable power to remedy Title VII violations is a recognition that "the use of (racial) goals means, in practice, that certain nonminority persons will be kept out solely on account of their race or ethnic background" and that this impinges on the basic principle "that individuals are to be judged as individuals, not as members of particular racial groups." EEOC v. Local 638, supra, 532 F.2d at 827. Accordingly, several members of this Court have stressed that quotas or goals must be approached only with reluctance, or at least in a "gingerly" fashion. See, e. g., Kirkland v. New York State Dep't of Correctional Services, 520 F.2d 420, 427 (2d Cir.), rehearing en banc denied, 531 F.2d 5 (2d Cir. 1975), cert. denied, 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976); EEOC v. Local 638, supra; Vulcan Society, supra, 490 F.2d at 398-99. In Kirkland, it was suggested that racial quotas are appropriate only when there has been "a clear-cut pattern of long-continued and egregious racial discrimination" and the reverse discriminatory effects are not felt by "a small number of readily identifiable" individuals. 520 F.2d at 427, 429. See also EEOC v. Local 638, supra, 532 F.2d at 827-28.
 
 
 119
 Yet the mere possibility that a race-conscious remedy may have an adverse impact on nonminority individuals does not render that remedy impermissible. In the context of seniority relief, for example, the Supreme Court has warned that the denial of relief
 
 
 120
 to identifiable victims of racial discrimination on the sole ground that such relief diminishes the expectations of other, arguably innocent, employees would if applied generally frustrate the central "make whole" objective of Title VII.
 
 
 121
 Franks v. Bowman Transp. Co., supra, 424 U.S. at 774, 96 S.Ct. at 1269. See also Kirkland v. New York State Dep't of Correctional Services, supra, 531 F.2d at 8 (Mansfield, J., dissenting from denial of rehearing en banc).
 
 
 122
 Turning to the record in the present case, we are persuaded that the type of affirmative relief ordered here i. e., that 102 minority candidates, to be identified, be offered firefighter positions before anyone else may be hired fits comfortably within the foregoing framework. The order gives primary consideration to actual victims of the City's past discrimination and was carefully tailored to fit the violations found. The City's tests, policies and practices unlawfully discriminated against minority candidates who applied; its discriminatory policies and practices unlawfully deterred other minority candidates from applying.[23] The court's order requires that the first persons to be placed on the list be minority candidates who applied to take the 1971 or 1975 exam and who were not offered, but still seek, employment in the fire department.[24] The next persons to be included are minority candidates who were unlawfully deterred from applying. To this extent the affirmative relief ordered by the district court seeks not only to remedy the effects of past discrimination but to further the "make whole" purpose which is central to the statutory scheme.
 
 
 123
 At this stage, of course, it cannot be known whether the total number of minority candidates who failed the exams or were deterred from applying is greater or less than the number of places on the required offering list. If the total exceeds the number of places, the affirmative relief ordered by the court will have been only compensatory[25] requiring offers only to identifiable victims of past discrimination and should thus pass muster even with members of this Court who are reluctant to impose quotas or goals. See, e. g., EEOC v. Local 638, supra, 532 F.2d at 834 (Feinberg, J., concurring) ("Focusing on individuals rather than on groups in granting relief, as by providing an immediate remedy to identifiable plaintiffs who were themselves discriminatorily denied jobs, can accomplish much without resort to quotas."); Kirkland v. New York State Dep't of Correctional Services, supra, 520 F.2d at 429 (Van Graafeiland, J., joined by Timbers and Hays, JJ.) ("We must address ourselves to individual rights.").
 
 
 124
 To the extent that the number of discriminatees who still seek firefighter jobs is less than the number of places on the list, the district court's order requires the City to devise a method for identifying additional minority persons to fill out the list. To this extent the affirmative relief would be more extensive than the compensatory relief and would be directed solely toward alleviating the effects of the City's past discrimination. It is this aspect of the order i. e., the contingent requirement of a minority offering in excess of the number of identifiable, still interested discriminatees that must be examined in light of the principles applicable to racial goals. Several factors persuade us that the nature of the court's noncompensatory efforts to eliminate the effects of past discrimination do not offend Title VII or the Constitution.
 
 
 125
 Preliminarily we observe that the relief ordered was neither intended to be, nor is it, a quota. In Rios v. Enterprise Ass'n Steamfitters Local 638, supra, a majority of the panel offered the following distinction between hiring quotas and hiring goals:
 
 
 126
 (W)hile to some the two words may be synonymous, the term "quota" implies a permanence not associated with "goal." For our purposes the significance of the distinction lies in the fact that once a prescribed goal is achieved the Union will not be obligated to maintain it, provided, of course, the Union does not engage in discriminatory conduct.
 
 
 127
 501 F.2d at 628 n.3. See also Kirkland v. New York State Dep't of Correctional Services, supra, 520 F.2d at 429-30. With this distinction in mind, Judge Daly stated that he would "impose a hiring goal," and that he "specifically decline(d) to impose a hiring quota." 479 F.Supp. at 114. We agree that the order does not impose a quota. The affirmative requirement as to hiring does not permanently intrude into the City's hiring process. There are 121 vacancies in the fire department. The order requires the City to make its next 102[26] offers to the minority candidates whose names are placed on the list to be compiled. Thereafter no numerical requirements whatever are imposed on the City, either as to the remaining vacancies or future vacancies: the City is required actively to recruit minority candidates to compete for vacancies in the fire department; and it is required to hire on a nondiscriminatory basis; but no permanent numerical requirements are established.
 
 
 128
 Further, we note that the court's order is properly viewed as setting hiring "goals" because it may well be that not all of the 102 minority candidates to be offered positions will actually accept the City's offers.[27] The City has represented that it cannot train new firefighters at a rate faster than 20 every three to six months. If the list contained as many as 102 names, a period of more than two years could elapse before the last candidates on the list received offers. If as few as 73 names are placed on the list, it appears that at least a year would elapse before the last persons on the list received offers. It is entirely possible that some of the candidates whose names are not near the top of the list will eventually decline to accept appointment to the fire department because of a change in interest or in circumstances during the one to two year interim period. Thus, although the order requires that the next 102 offers be made to minority candidates, it does not mean that minority candidates will be the next 102 persons hired.
 
 
 129
 Nor does the fact that no nonminority persons will be offered firefighter positions until the City has offered such positions to the persons on the required list mean that the order imposes 100% hiring goals (or, as defendants characterize it, a "100% quota"). The present order must be read in conjunction with the court's interim hiring orders of 1976 and 1977. Those interim orders, which permitted the hiring of 84 firefighters from the 1975 list, expressly provided that those 84 appointments would be counted "as part of" any subsequent court-ordered hiring plan. Thus although the 1979 hiring order is, on its face, limited to minority appointments, 81 nonminority appointments have already been made as part of the hiring plan. As a result of our modification of the size of the offering list, see Part B, infra, the court's order will in fact result in minority appointments to fewer than 50% of the firefighter positions filled since 1975.
 
 
 130
 Moreover, the order does not require the City to achieve a specified racial balance in the fire department; rather the number of minority candidates to whom firefighter positions must be offered is measured against the number of firefighters hired since the first adjudicated discriminatory act. In this respect, the scope of the remedy is more limited than other hiring goals previously approved by this Court (and, indeed, more limited than the initial remedial order in this case see Part I.C. supra). In Rios v. Enterprise Ass'n Steamfitters Local 638, supra, and EEOC v. Local 638, supra, for example, the challenged orders required the defendant unions to achieve certain goals of overall minority membership. In Vulcan Society of the New York City Fire Dep't v. Civil Service Comm'n, supra, 490 F.2d at 399, this Court approved a hiring ratio that was "midway between what would have been appropriate on the basis of correcting the inequities" of the challenged exam and "the plaintiffs' demands for much more extensive relief." By focusing solely on appointments during the period of proven civil rights violations rather than on overall membership in the fire department, the order here clearly seeks to "correct past discriminatory practices," rather than to "attain racial balance," United States v. Wood, Wire & Metal Lathers Int'l Union, Local 46, supra, 471 F.2d at 413, thereby avoiding any possible conflict with § 703(j).
 
 
 131
 Nor do we see that any adverse effects of the establishment of the required offering list will "fall upon 'a small number of readily identifiable' nonminority persons." ADE v. City of Bridgeport, supra, 594 F.2d at 310, quoting Kirkland v. New York State Dep't of Correctional Services, supra, 520 F.2d at 429. Those applicants who were hired pursuant to the two interim hiring orders will retain their jobs. Although other nonminority applicants who were placed on the City's appointment list pursuant to the 1975 exam will not be offered positions as early as, or may be passed over in favor of, lower-ranked minority applicants, and possibly in favor of minority persons who did not apply for positions as firefighters, this result will not defeat the nonminority applicants' legitimate expectations. The only source of their expectations was the 1975 exam; and that exam was illegal. And since the mere fact of application to take the exam could not have given rise to any very credible expectation of actual employment, nonminority applicants will not be unduly burdened if some minority nonapplicants are hired pursuant to the court's order.
 
 
 132
 Finally, the hiring goal is amply supported by the district court's conclusion that "the City of Bridgeport has engaged in a 'clear-cut pattern of long-continued and egregious racial discrimination' with regard to hiring in the Bridgeport Fire Department." 479 F.Supp. at 112-13. The court based this conclusion, and the conclusion that it was Bridgeport's policy to discriminate against minorities, on specific findings of fact. These included the findings that, in addition to administering discriminatory exams, the City had purposely failed to recruit minority applicants,[28] had actively deterred interested minority applicants, and had discriminated against several individual minority candidates, and that the City's failure to recruit and its discriminatory treatment of minority individuals were not in good faith. The factual predicates for the court's conclusion of long-standing egregious discrimination are well supported by the evidence and are not challenged on this appeal.
 
 
 133
 In sum, we conclude that the district court's order requiring the City to compile a list of minority persons, giving priority to those who were victims of the City's discrimination, and to offer firefighter positions to those persons before hiring anyone else, was not an abuse of the court's discretion. We turn now to the question of the appropriateness of court's selection of 102 as the number of offerees.
 
 B. The Numerical Scope of the Order
 
 134
 The district court arrived at 102 as the number of persons to be offered firefighter positions, by reference to two factors. First, having found the City in violation of Title VI dating back to January 1, 1971, the court chose the period beginning on that date as the time frame within which to count the nonminority firefighters who had been hired pursuant to the discriminatory exams. Second, the court ruled that the number of minority persons offered firefighter positions should be approximately 41% of the total number of firefighters hired during the relevant period. We conclude that the time frame must be modified, but that the percentage selected was not an abuse of the court's discretion.
 
 
 135
 In Part IV above we concluded that the district court's decision must be vacated insofar as it held that the City had violated Title VI. The Title VI violation found by the district court dated back to 1971. The City's violation of the Revenue Sharing Act found by the district court, and not contested here, dates back only to January 1, 1973. The City's violation of Title VII dates back only to March 24, 1972, when Title VII became applicable to the City. Hence, the earliest date on which the City was properly held to have discriminated unlawfully is March 24, 1972, and we conclude that the proper time frame for calculating the required number of minority offerees began in 1972.[29]
 
 
 136
 The evidence of record reveals that since March 24, 1972, the City has hired a total of 109 nonminority firefighters. Consequently, whatever percentage is appropriate should relate to this figure, not to the 152 nonminority figure that dates back to 1971. If the 41% figure used by the district court is sustainable, the City will be required to offer firefighter positions to 73 minority persons i. e., the number which, when added to the three minority persons hired within the relevant period, would bring the total minority offerees (76) to approximately 41% of the total (185).
 
 
 137
 The district court's selection of the 41% figure, however, is somewhat problematical and if the affirmative relief ordered were of a different sort, we might be constrained to request clarification or reconsideration from the district court. Given the actual nature and effect of the order, however, we conclude that the use of this percentage was not an abuse of discretion.
 
 
 138
 The question arises initially from the ambiguity of the court's characterization of the 41% figure. The figure was described at the outset of the opinion as the percentage of minorities in the "labor force" in Bridgeport, see 479 F.Supp. at 105, and later as the percentage of minority individuals in Bridgeport's "population," see id. at 115.[30] See also 454 F.Supp. at 757. Plaintiffs argue that the 41% figure does represent the 1975 percentage of minorities in the labor force, and that the City judicially admitted this fact. In fact the City did admit the components of this,[31] and it never asked the district court to relieve it of its admission, although on the remand after the first appeal to this Court it attempted to introduce new statistics into evidence; these apparently were intended to show that while the percentage of minority persons in the population was 41%, the percentage of minority persons in the labor force was substantially lower. On this appeal the City contends that the percentage of minority persons in the labor force in 1975 was 23%, a figure that plaintiffs contend is "impossible."[32] Given the nature of the order in the present case, however, we need not reach the question whether the City may or should now be relieved of its judicial admission.
 
 
 139
 In cases in which the district court has fashioned a remedy that requires the defendant to achieve a specified percentage of minority representation in its overall membership or among all its employees, we have ruled that "(s) tatistics as to the population of th(e) work force during the pertinent period should provide a more accurate base than total population statistics for determining what would have been the percentage" of minority applicants hired absent the discrimination. Rios v. Enterprise Ass'n Steamfitters Local 638, supra, 501 F.2d at 632-33. In Rios, the district court had ordered the defendant union to admit minority workers in sufficient numbers to achieve a 30% minority membership. Because the provenance of the 30% figure was not clear, and could have represented population rather than labor force, we remanded to the district court for explanation or reconsideration. On the other hand, we have more recently envisioned that temporary goals that exceed the minority proportion of the labor force may be justified if the discrimination has been long-standing and effective:
 
 
 140
 Any use of a hiring ratio during the interim period to compensate for prior discrimination, that is, a ratio greater than the minority percentage in the applicant pool or the relevant work force, should be imposed only upon clear evidence and appropriate findings of the need to redress demonstrated prior discrimination of long standing that has had a significant impact on minority employment.
 
 
 141
 Guardians IV, supra, 630 F.2d at 109 (citations omitted); United States v. City of Buffalo, 633 F.2d 643, 646-47 (2d Cir. 1980) (per curiam).
 
 
 142
 In the present case, the amply supported findings of longstanding, egregious discrimination, resulting in a fire department with four minority firefighters out of 512, easily meet the constraints of Guardians IV. Moreover, the present order differs from that in Rios in that it does not establish a goal of 41% minority representation in the fire department. Since the order uses as its frame of reference only the period during which the City's discrimination is held unlawful, with the percentage being applied only in relation to nonminority hirees in that limited period, minority representation in the fire department will not, on the basis of the order, come anywhere near 41%. The City now has a total of approximately 508 nonminority firefighters (427 in 1975, plus 81 hired pursuant to the interim orders), and 4 minority firefighters. Using the time frame chosen by the district court, the City was to offer positions to 102 minority firefighters. If all 102 accepted, minority firefighters would total 106 out of 614, or 17.3% far below even the 23% that the City has here contended is the accurate labor force percentage. The effect of our modification of the time frame is to reduce the percentage even lower: with 73 new minority firefighters, minorities would total 77 out of 585, or 13.2%.
 
 
 143
 Indeed, since the district court's order does not actually require hiring but only offering (see note 26, supra, and accompanying text), 13.2% is the maximum minority representation that would be achieved in the fire department on the basis of the affirmative relief granted by the order. Any declinations by minority offerees would decrease the percentage pro tanto.
 
 
 144
 In all the circumstances, we find the district court's use of the 41% figure well within the bounds of its discretion. In recognition of our ruling as to Title VI, we simply direct that the order be modified to limit the number of minority persons to whom offers must be made, before anyone else is hired, to 73.[33]
 
 C. Seniority and the Promotional Freeze
 
 145
 The district court's order, in a section entitled "Seniority," prohibits the City "from giving any promotional examinations to firefighters hired from lists generated by the 1971 or 1975 tests until such time as all the (applicants and those who were deterred from applying for the 1971 and 1975 exams) become qualified to take the promotional examinations." 479 F.Supp. at 117 (footnote omitted). Appellants claim that the promotional freeze impermissibly violates the rights of currently employed firefighters. On the other hand, plaintiffs contend that the district court did not award enough seniority relief. We reject defendant's contentions but find some merit in those of the plaintiffs.
 
 
 146
 In Franks v. Bowman Transp. Co., supra, the Court noted that "(s)eniority systems and the entitlements conferred by credits earned thereunder are of vast and increasing importance in the economic employment system of this Nation" and that, accordingly, if a victim of discrimination is awarded hiring relief only, without seniority, he "will never obtain his rightful place in the hierarchy of seniority according to which these various employment benefits are distributed." 424 U.S. at 766, 768, 96 S.Ct. at 1265, 1266. The Court further stated that the possibility that nonminority expectations will be diminished should not prevent awards of constructive seniority to the victims of discrimination:
 
 
 147
 (I)n exercising their equitable powers, district courts should take as their starting point the presumption in favor of rightful place seniority relief and proceed with further legal analysis from that point; and that such relief may not be denied on the abstract basis of adverse impact upon interests of other employees but rather only on the basis of unusual adverse impact arising from facts and circumstances that would not be generally found in Title VII cases.
 
 
 148
 424 U.S. at 779 n.41, 96 S.Ct. at 1271 n.41. See also id. at 774, 96 S.Ct. at 1269.
 
 
 149
 In this case, the court recognized that the wrongful denials of employment to minority individuals in the past would delay their eligibility for promotions. The decision to equalize promotional seniority by delaying the eligibility of those who have already been hired, rather than by ordering instant eligibility for those to be hired, apparently manifests a concern for public safety, and was well within the court's discretion. We note also that the burden of this provision is not itself discriminatory: it does not fall just on nonminority firefighters, but must be borne also by all four of the minority firefighters presently in the department. Moreover, the court did not bar the City from shortening the time-in-grade requirement for the taking of promotional exams, but rather deferred to the City's expertise in deciding whether or not public safety really requires a three-year time-in-grade period. Thus, it may be within the City's power to lessen the burden for those who are already firefighters. To the extent, however, that the time-in-grade requirements must be maintained in order to ensure public safety, the promotional freeze may well prove to be the only method of insuring access to promotions for past victims of the City's discrimination.
 
 
 150
 Finally, we note that the delay of promotional eligibility is strictly for the purpose of compensating the victims of the City's discrimination. Although the offeree list may include persons who neither applied to take nor were deterred from taking the 1971 or 1975 exam, the order does not require a delay in promotional eligibility to await the eligibility of such nondiscriminatees.[34]
 
 
 151
 In addition to the promotional freeze, the district court's backpay order provided compensation for the loss of certain other seniority benefits in the form of the monetary value of salary increments, pension rights, and fringe benefits, see 479 F.Supp. at 118-19 (definition of backpay). We conclude, however, as plaintiffs argue, that these provisions may have been inadequate as "make-whole" seniority relief. It seems clear that the district court should have awarded to discriminatees the full measure of constructive seniority. See generally Franks v. Bowman Transp. Co., supra, 424 U.S. at 763-67, 96 S.Ct. at 1263-1265. Although plaintiffs have not specified what other privileges of seniority they believe have been denied, it may well be that some have been overlooked. For example, if the City maintains a typical last-hired-first-fired seniority system, constructive seniority with respect to lay-offs would be essential to "make whole" relief under Title VII. See id. Moreover, the City's seniority system may afford other benefits, such as increased vacation and sickpay entitlements, that should be awarded to discriminatees in order to give them their "rightful place" in the seniority hierarchy. Because the present record does not fully reveal the workings of the City's seniority system, and because it is not clear how full constructive seniority may best be coordinated with the liquidated seniority benefits already conferred in the backpay section of the district court's order, we remand the matter to the district court so that it may appropriately modify its decree.
 
 D. The Backpay Award
 
 152
 After Albemarle Paper Co. v. Moody, supra, there can be no doubt that the award of backpay is central to the "make whole" purpose of Title VII:
 
 
 153
 (G)iven a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination. The courts of appeals must maintain a consistent and principled application of the backpay provision, consonant with the twin statutory objectives, while at the same time recognizing that the trial court will often have the keener appreciation of those facts and circumstances peculiar to particular cases.
 
 
 154
 422 U.S. at 421-22, 95 S.Ct. at 2373-2374 (footnote omitted). See also EEOC v. Local 638, supra, 532 F.2d at 832. Having reduced to a maximum of 73 the number of persons who may receive backpay,[35] we note three further respects in which the district court's backpay order requires modification.
 
 
 155
 First, we find merit in the City's challenge to one of the starting dates for the back pay award. The district court's order provides that persons who were discriminated against with respect to the 1975 exam are entitled to back pay dating back to October 1976, the date on which the City first hired firefighters from the 1975 list. It is clear, however, that not all of the 81 nonminority persons hired pursuant to the 1975 test results were hired in October 1976. Some were hired pursuant to the interim order entered in June 1977. And although the 1976 interim order permitted the immediate hiring of 40, the evidence reveals that only 20 were hired in October 1976, with the remaining hired in 1977. Since "(l)ogically, back pay should be awarded from the date of the unlawful discrimination," Davidson, "Back Pay" Awards under Title VII of the Civil Rights Act of 1964, 26 Rutgers L.Rev. 741, 760 (1973), the district court's order should be modified to ensure that the number of minority firefighters to be paid back pay dating back to a given date does not exceed the number of nonminority firefighters hired on that date.
 
 
 156
 Second, we note that to the extent that the backpay list is not filled with persons to whom firefighter positions must be offered, the names of other actual victims of the City's discrimination may be added. The latter group would include, for example, those who applied for and failed the exams but who are no longer interested in firefighter positions or who do not now meet the City's other requirements. As to this nonofferee group the district court's order does not set a termination date for the backpay obligation. The order should be modified to end the backpay period as of the time the nonofferee ceased or failed to meet any of the City's requirements other than the written exam, or ceased to have interest, whichever is earlier.
 
 
 157
 Finally, we find merit in plaintiffs' contention that, as to certain facts relating to the nonofferees group's entitlement to backpay, the court improperly allocated the burden of proof. The order properly placed on each such person the burden of proving that he applied to take the 1971 or 1975 exam, or that he was deterred from applying by the City's discriminatory policy or practices. However, the order also places on these discriminatees the burden of proving that they met the City's requirements other than passage of the written exam. The latter allocation is contrary to Title VII principles. See Cohen v. West Haven Board of Police Commissioners, 638 F.2d 496, 502 (2d Cir. 1980). Where there has been an unlawful refusal to hire, individual class members may establish their prima facie entitlement to backpay simply by showing that they applied for the job and were not hired. Sledge v. J. P. Stevens & Co., 585 F.2d 625, 637 (4th Cir. 1978), cert. denied, 440 U.S. 981, 99 S.Ct. 1789, 60 L.Ed.2d 241 (1979). See also Rodriguez v. Taylor, 569 F.2d 1231, 1239 (3d Cir. 1977), cert. denied, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978); Swint v. Pullman-Standard Co., 539 F.2d 77, 103 (5th Cir. 1976); EEOC v. Local 638, supra, 532 F.2d at 832-33. Cf. International Brotherhood of Teamsters v. United States, supra, 431 U.S. at 361-62, 97 S.Ct. at 1867-1868. Similarly, where an unlawful policy and practice of discrimination has been proven, one who was thereby deterred from applying for employment may establish his prima facie entitlement to backpay by proving such deterrence. See id. at 365-67, 97 S.Ct. at 1869-1870; Grant v. Bethlehem Steel Corp., 635 F.2d 1007, 1016 (2d Cir. 1980). The burden then shifts to the defendant to rebut this prima facie showing by proving that the class member would not have been hired even absent discrimination for example, because no vacancies existed or because the claimant failed to meet nondiscriminatory prerequisites for employment. E. g., Sledge v. J. P. Stevens & Co., supra, 585 F.2d at 637; Rodriguez v. Taylor, supra, 569 F.2d at 1240; White v. Carolina Paperboard Corp., 564 F.2d 1073, 1086 (4th Cir. 1977); cf. Franks v. Bowman Transp. Co., supra, 424 U.S. at 772-73 & n.32, 96 S.Ct. 1267-1268 n.32.
 
 
 158
 With respect to most of the City's prerequisites i. e., those relating to the candidate's age, residence, education, and possession of a driver's license we would expect the allocation of the burden of proof to have little impact. However, two prerequisites relate to the physical condition of the candidate in 1971 or 1975, and the order would require that the nonofferee candidate prove that he would have passed the physical agility test and the medical tests that were administered. Proof of prior health or physical conditioning may not be so readily available as would be proof of age, education, etc. If direct proof is unavailable on these questions, it is attributable to the discriminatory policies and practices of the City, which prevented the actual taking of such tests as would have been taken, absent the discrimination. Therefore, to the extent that it is uncertain whether a candidate would have met the City's nondiscriminatory requirements, the uncertainty "should be resolved against the defendant, the party responsible for the lack of certainty." Cohen v. West Haven Board of Police Commissioners, supra, 638 F.2d at 502; Stewart v. General Motors Corp., 542 F.2d 445, 452 (7th Cir. 1976), cert. denied, 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977); Day v. Matthews, 530 F.2d 1083, 1086 (D.C.Cir.1976) (per curiam). Paragraphs D(1)(b)(1)-(v) and D(1)(c)(i)-(v) of the district court's order, relating to the burden of proof on these requirements, should be modified accordingly.
 
 VI. CONCLUSION
 
 159
 We affirm the district court's ruling as to liability under Title VII and the Revenue Sharing Act, and vacate the finding of liability under Title VI. We remand for modification of the remedial provisions, in accordance with this opinion, (1) to decrease to 73 the number of minority persons who must be offered firefighter positions; (2) to decrease to a maximum of 73 the number of minority persons who are awarded backpay; (3) to adjust the starting and ending dates of certain backpay awards; (4) to allow discriminatees to prove their prima facie entitlement to backpay by showing that they applied to take the 1971 or 1975 exam, or were deterred from so applying by the City's discriminatory practices; and (5) to award appropriate constructive seniority to individual discriminatees who are hired. In all other respects, we affirm the judgment of the district court.
 
 
 160
 No costs.
 
 VAN GRAAFEILAND, Circuit Judge (concurring):
 
 161
 I wish that I could concur without reservation in Judge Kearse's comprehensive opinion, but I am unable to do so.
 
 
 162
 In the first place, I believe that the district court erred in not reopening the proof on remand to permit full development of the facts relative to the claim on long-continued and historical discrimination. Without more knowledge of the factual background, I find little support for a finding of long-term discrimination in figures which show that only one black took a test in 1965 and only three blacks took a test in 1968, and none of the four passed. Twenty-two white persons failed to pass these same examinations. On this proof alone, I am not prepared to assume that four failed because they were black and twenty-two failed although they were white.
 
 
 163
 I am also disturbed about the increased fervor of the attacks upon written civil service examinations. See Kirkland v. New York State Department of Correctional Services, 520 F.2d 420, 428-29 (2d Cir.), rehearing en banc denied, 531 F.2d 5 (2d Cir. 1975), cert. denied, 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976). I do not agree that every high school graduate who can pass a physical examination is qualified to become a fire fighter. Assuming, however, that this is so, I am convinced that some high school graduates are better qualified than others. If, five years from now, 1,000 high school graduates pass the physical examination for 100 job openings in the Bridgeport Fire Department, what criteria besides race and sex shall the City use in deciding which ones to hire? Must it revive the discredited spoils system?
 
 
 164
 I do not believe that a municipality which works with a "respected management firm" to develop, at a cost of $100,000.00 and 2,745 manhours, a legally satisfactory examination and thereafter uses the examination in good faith is following a policy of discrimination. If the examination is unsatisfactory, the proper course, I submit, is to prepare another one, not to require firemen to trust their lives to colleagues who are thrust upon them by a federal court and whose sole qualifications are the possession of a Connecticut driver's license and an all-too-easily obtainable high school diploma.
 
 
 165
 Finally, I am concerned about that portion of the majority opinion which orders affirmative relief for others than discriminatees. In 1975 white males comprised only twenty-eight percent of Bridgeport's labor force. Twenty percent were black and Hispanic males, and fifty-two percent were women. Although the judgment herein is limited to blacks and Hispanics, it is quite obvious that women have no greater representation than blacks or Hispanics in the Bridgeport Fire Department. It is not unreasonable, therefore, to anticipate that litigation on behalf of the female members of the "minority" will follow plaintiffs' successful efforts in this case. See 42 U.S.C. § 2000e-2(a). I have already expressed my concern that we are headed inexorably to a situation in which the white American male, because of his "majority" status, will be legally precluded from holding more than a minority of jobs in any field. See Local Union No. 34, IBEW v. City of Hartford, 625 F.2d 416, 425-29 (2d Cir. 1980) (Van Graafeiland, J., dissenting). It appears that this field will in due course include membership in the Bridgeport Fire Department.
 
 
 166
 Despite the foregoing reservations, I think that racial harmony in Bridgeport will be advanced best by bringing this protracted litigation to a close. I therefore concur in the result.
 
 
 
 [1]
 The term "minority" has been used in this case to refer to black and hispanic persons, and will be so used in this opinion
 
 
 [2]
 The court noted, for example, that having a feel for public relations was ranked just as highly as composure under pressure
 
 
 [3]
 Although eleven cities joined in having the test developed, only Bridgeport chose to use it after seeing the questions
 
 
 [4]
 The passing score on the 1975 exam was set at 12 the score that marked the 75th percentile in performance. It is not clear why this cutoff was chosen; Bridgeport's City Charter required that candidates answer correctly at least 75% of all exam questions, not that passing candidates be better than 75% of those taking the exam
 
 
 [5]
 For example, Request No. 107 stated: "Lack of detail on the job analysis used in constructing the 1975 test was an asset rather than a detriment to the accuracy of the test."
 
 
 [6]
 The witness described three possible approaches. The first involved creation of two pools white candidates and minority candidates and the selection from each pool, according to rank within the pool, of a number of candidates in proportion to the number who took the exam. Under the second approach, one applicant pool would be created with a sufficient proportion of minority individuals to make it likely that random selection from the pool would result in minority hires in proportion to the number of minority applicants. The third approach involved creation of separate minority and nonminority pools, with candidates selected at random from each pool in proportion to the number of applicants who took the exam
 
 
 [7]
 Plaintiffs' expert testified that the likelihood that such a difference would be attributable to chance would be less than five chances in one thousand
 
 
 [8]
 Of the 384 applicants who took the three tests, the races of 53 were unknown. All 53 failed the examinations. The court noted that even if it were assumed that all 53 were white the hypothesis most unfavorable to plaintiffs' claims the pass rate for whites would be reduced only from 36.2% to 30.9%, a percentage far above the 4.8% minority pass rate
 
 
 [9]
 A. OLD EXAMS
 The test batteries given as written exams to firefighter candidates in 1971 and 1975 shall not again be used to test firefighter applicants.
 B. HIRING
 (1) The City promptly shall prepare a list of 102 minority persons to be offered positions as firefighters. This list shall include:
 (a) The black and hispanic persons who filed applications for either the 1971 or 1975 test, who have not been offered but still seek employment with the Fire Department, and who pass both the agility test and medical examination to be administered by the City. Said agility test and medical examination shall be given to these persons within 120 days of this order, shall be preceded by both published notice and individual written notice to each of those black and hispanic persons who filed applications for the 1971 or 1975 firefighters test, and shall be no more rigorous than those that have been administered to the firefighters hired since January 1, 1971.
 (b) Sufficient additional minority persons chosen in accordance with this subparagraph to reach the total of 102 persons. The persons chosen under this subparagraph shall be individuals who prove to the special master that after January 1, 1971 they were deterred by the City's discriminatory practices from applying to take either the 1971 or 1975 test, and who pass both the agility test and medical examination to be administered by the City. The following procedure shall be used to identify these persons:
 (i) The special master shall, in a manner he deems appropriate, publicize the fact that he will be accepting applications from minority persons who claim that after January 1, 1971 they were deterred by the City's discriminatory practices from filing applications for either the 1971 or 1975 firefighters test. The special master shall set and publicize a reasonable deadline for the submission of such applications.
 (ii) The special master shall process the applications in a manner consistent with this opinion, and may hold hearings or other proceedings as he deems appropriate.
 (iii) Each individual applicant shall bear the burden of proving by a preponderance of the evidence that he or she would have applied but for the City's discriminatory practices.
 (iv) The special master need not process every application, but may choose among them at random until sufficient applications have been processed to complete the list of 102 minority persons to be offered employment.
 (v) The agility test and medical examinations shall be administered to persons chosen by the special master at a time to be determined by the special master, and shall be preceded by written notice to the individuals to be tested and examined. The agility test and medical examination shall be no more rigorous than those that have been administered to the firefighters hired since January 1, 1971.
 (c) If the procedures under subparagraphs (a) and (b) of this paragraph fail to produce sufficient individuals to fill the 102 places on the list, the City, subject to the Court's approval, promptly shall devise some other method for identifying additional minority persons to be placed on the list.
 (2) Notwithstanding the above, the City shall not be obligated to place on the list the name of anyone who
 (a) on or before the date of the exam for which he or she applied or would have applied but for the City's discrimination
 (i) was not eighteen years of age;
 (ii) had not graduated from high school or earned a high school equivalency certification;
 (iii) did not possess a valid Connecticut driver's license; or
 (iv) had not been a bona fide resident of Bridgeport for the past year, or
 (b) does not possess a valid Connecticut driver's license on the date the name otherwise would be placed on the list, but
 (c) nothing in this paragraph shall alter or limit the City's obligation ultimately to place 102 names on the list.
 (3) As quickly as possible within the limits of the City's ability to train new firefighters, the City shall offer the 102 persons on the list active employment as firefighters and shall place those who accept on active duty. The City shall make a good faith effort to maximize its ability to train firefighters. No other individuals shall be hired as firefighters until all of the individuals on the list have been offered active employment.
 (4) Subsequent appointments to the rank of firefighter shall be made in strict accordance with Titles VI and VII of the Civil Rights Act of 1964.
 (5) The City actively shall recruit minority persons to compete for future vacancies in the Fire Department.
 (6) This Court shall retain jurisdiction over this case until the provisions of this Order have been complied with.
 C. SENIORITY
 The City is prohibited from giving any promotional examinations to firefighters hired from lists generated by the 1971 or 1975 tests until such time as all the firefighters hired pursuant to B(1)(a) & (b) become qualified to take the promotional examinations. Although the Court specifically is declining to alter the three-year time-in-grade requirement that now exists for firefighters who wish to take the promotional examination for the positions of Pump Engineer and Lieutenant, the Court is not opposed to a reduction of this requirement. The plausibility of reducing the time-in-grade requirement by establishing an improved training program for all firefighters involves a decision that must be left to the experienced judgment of the authorities in the Fire Department. Until such time as promotional examinations are administered, the City may fill promotional vacancies on an acting or provisional basis, except that acting or provisional supervisors shall not be given any preference in the selection of permanent supervisors. In selecting acting or provisional supervisors, the City is urged to take cognizance of the prior firefighting experience of a number of the plaintiffs.
 D. BACK PAY
 (1) The City promptly shall generate a list of up to 102 persons to be awarded back pay. This list shall include:
 (a) Each of the persons whose name is placed on the hiring list pursuant to B(1)(a) or (b).
 (b) If fewer than 102 persons qualify under subparagraph (a) of this paragraph, additional minority persons chosen in accordance with this subparagraph up to a maximum of 102. Persons chosen in accordance with this subparagraph shall be minority persons who applied to take either the 1971 or 1975 exam whose names are not placed on the hiring list pursuant to B(1)(a) but who prove to the special master, by a preponderance of the evidence, that on the date of the exam for which they applied, they
 (i) were eighteen years of age,
 (ii) had graduated from high school or earned a high school equivalency certification,
 (iii) possessed a valid Connecticut driver's license,
 (iv) had been a bona fide resident of Bridgeport for the past year, and
 (v) would have passed the agility test and medical examination administered to applicants who did pass one of the exams.
 If fewer than 102 individuals qualify for back pay under subparagraph (a) of this paragraph, the special master shall notify each of the individuals potentially eligible for back pay under this subparagraph that they may file applications for back pay awards, and shall set a reasonable deadline for the filing of such applications. He need not process every application, but may choose among them at random until sufficient applications have been processed to fill the total of 102 places on the back pay list.
 (c) If fewer than 102 individuals qualify under subparagraphs (a) and (b) of this paragraph, additional minority persons chosen in accordance with this subparagraph up to a maximum of 102. Persons chosen in accordance with this subparagraph shall be minority persons whose names are not placed on the hiring list pursuant to B(1)(b) but who prove to the special master by a preponderance of the evidence that but for the defendants' discriminatory practices they would have applied to take either the 1971 or 1975 exam, and that on the date of the exam for which they would have applied they
 (i) were eighteen years of age,
 (ii) had graduated from high school, or earned a high school equivalency certification,
 (iii) possessed a valid Connecticut driver's license,
 (iv) had been a bona fide resident of Bridgeport for the past year, and
 (v) would have passed the agility test and medical examination administered to applicants who did pass one of the exams.
 If fewer than 102 individuals qualify for back pay under subparagraphs (a) and (b) of this paragraph, the special master, in a manner he deems appropriate, shall publicize the fact that he will be accepting applications from individuals who claim to meet the requirements of this subparagraph, and shall set a reasonable deadline for the filing of such applications. He need not process every application, but may choose among them at random until sufficient applications have been processed to fill the total of 102 places on the back pay list.
 (d) If fewer than 102 individuals qualify under subparagraphs (a), (b), & (c) of this paragraph, the remaining places on the back pay list shall remain vacant.
 (2) Each of the persons whose name is placed on the back pay list shall be entitled to accumulated back pay at the time his or her name is placed on the list.
 (3) For the purposes of this order, back pay shall include
 (a) the sum of the value of all regular and overtime wages, fringe benefits, pension benefits, and all other benefits to which firefighters are or were entitled under union contracts, including all increments, together with interest and, for those individuals whose names are on the hiring list established pursuant to this order, "front pay" until the date the individual is offered active employment,
 (b) reduced by the sum of amounts earned or earnable with reasonable diligence and amounts of any welfare or unemployment compensation received.
 (4) The individuals whose names are on the list who either applied to take or were deterred by defendants' discriminatory practices from applying to take the 1971 test shall be awarded back pay from October, 1973 (two years prior to the filing of the first complaint with the EEOC).
 (5) The individuals whose names are on the list who either applied to take or were deterred by defendants' discriminatory practices from applying to take the 1975 test shall be awarded back pay from October, 1976 (when the first firefighter was hired from the 1975 list).
 (6) While considerations of back pay liability may not enter into determining whose names shall be placed on the list, the City may, if it chooses, offer active employment to those on the hiring list in an order that will minimize its liability for "front pay." It would seem to make sense in terms of both economics and social policy for the City to offer active employment first to those with the least present income.
 
 
 [479]
 F.Supp. at 115-19 (footnotes omitted)
 
 
 [10]
 In answer to this Court's question as to the effect of the interim orders permitting the hiring of 84 firefighters from the 1975 test list, the district court found that
 (p)laintiffs agreed not to seek to enjoin defendants from hiring firefighters from the 1975 list, provided that defendants warranted that there was and would remain an immediate need and adequate funding for a number of firefighters equal to the number actually hired pursuant to the agreement.
 
 
 [479]
 F.Supp. at 105 n.4. It concluded that the defendants did not thereby agree to quota-type relief or concede that any relief would be appropriate, and the plaintiffs did not agree that the City would not be liable for backpay
 
 
 [11]
 Testimony at the hearing had indicated that there were currently 121 vacancies, although not all vacancies could be filled simultaneously
 
 
 [12]
 The order allowed exclusion of persons who did not meet the City's requirements as to age, residence, education, and possession of driver's license
 
 
 [13]
 On October 1, 1979, the district court granted a conditional stay of its judgment pending appeal. The conditions attached to the stay included a provision that "(t)he defendants hire at least two minorities for every white (defendants may hire a total of twenty one persons of whom 14 are minority and 7 are white)." This Court subsequently continued the stay on condition that the City satisfy the conditions set out therein. We are informed that additional hiring of firefighters has in fact taken place
 
 
 [14]
 Defendants purported to appeal from all portions of the district court's "Memorandum of Decision and Order." The City, however, has not asserted any error in the court's holding it liable for violation of the Revenue Sharing Act. BFME, in its brief on this appeal, merely states its unelaborated contention that the Revenue Sharing Act does not provide a basis for liability in this action; it states that since the district court did not impose a remedy under that statute, BFME does not address it. It should be noted that this Court has recently held that backpay is a remedy available to a successful plaintiff under the Revenue Sharing Act. Cohen v. West Haven Board of Police Commissioners, 638 F.2d 496 (2d Cir. 1980)
 
 
 [15]
 Defendants make two additional arguments which merit but brief mention. First, they argue that questions of pre-1975 discrimination were never litigated in the district court. This contention is baseless. The complaint's challenge to the City's use of unlawful exams was not limited to the 1975 exam. While the 1971 exam was not mentioned in haec verba, several of the allegations related to that exam rather than the 1975 exam. The defendants, in turn, asserted a two-year statute of limitations with respect to acts occurring more than two years prior to July 1976. In pretrial discovery, plaintiffs asked numerous questions about the City's practices dating back to 1965, with interrogatories, for example, asking a breakdown of test applications, by race, for each year from 1965 to 1975. At trial, plaintiffs' first post-pedigree question to their first witness asked about his taking the 1971 exam. Defendants' immediate objection was followed by colloquy in which plaintiffs pointed out, inter alia, that post-Title VII hiring had occurred pursuant to the 1971 test. The court overruled defendants' objection and thereafter a considerable amount of evidence was received with respect to (a) the nature of the firefighter exams given in 1965, 1968, and 1971; (b) the pass rates of minority and nonminority persons who took these exams; (c) the fact that the City made no attempt to validate any of its exams prior to 1972; and (d) various other aspects of the City's " 'long-continued' " history of discrimination
 In addition we reject defendants' contention that the doctrine of laches bars relief for the pre-1975 hirings. Assuming, without deciding, that the doctrine applies in Title VII cases, see, e. g., Occidental Life Ins. Co. v. EEOC, 432 U.S. 355, 373, 97 S.Ct. 2447, 2458, 53 L.Ed.2d 402 (1977); Albemarle Paper Co. v. Moody, 422 U.S. 405, 424-25, 95 S.Ct. at 2362, 2374-2375, 45 L.Ed.2d 280 (1975); Boone v. Mechanical Specialties Co., 609 F.2d 956, 958-59 (9th Cir. 1979); Bernard v. Gulf Oil, Inc., 596 F.2d 1249, 1256-58 (5th Cir.), rehearing en banc granted, 604 F.2d 449 (5th Cir. 1979), aff'd in relevant part on rehearing en banc, 619 F.2d 459 (5th Cir. 1980), cert. granted, 49 U.S.L.W. 3428 (U.S. Dec. 8, 1980), we note that defendants did not assert this defense in the district court, and that they have failed in this Court to make any showing of substantial prejudice such as is ordinarily necessary to invoke such a defense.
 
 
 [16]
 The Guardians litigation had resulted in two prior appeals to this Court, reported at 490 F.2d 400 (2d Cir. 1973) (affirming denial of preliminary injunction), and at 562 F.2d 38 (2d Cir. 1977) (mem.) (vacating preliminary injunction and remanding for reconsideration in light of International Brotherhood of Teamsters v. United States, supra )
 
 
 [17]
 If the complainant has not "initially instituted" proceedings before a state antidiscrimination agency, the applicable limitations period is 180 days. 42 U.S.C. § 2000e-5(e) (1976). Defendants have not challenged the applicability of the 300 day period
 
 
 [18]
 Our prior opinion neither explicitly required nor forbade consideration of Title VI. Rather, our request that the district court clarify the theories on which any pre-1972 liability was found implicitly permitted the consideration on remand of any available theory
 
 
 [19]
 The recent decisions in this Circuit have generally assumed the existence of a private right of action under Title VI. See, e. g., Guardians III, supra, 633 F.2d at 270-71 (Kelleher, D. J., concurring); id. at 274 (Coffrin, D. J., concurring); Bryan v. Koch, 627 F.2d 612 (2d Cir. 1980); Lora v. Board of Education, 623 F.2d 248 (2d Cir. 1980). Although the Supreme Court has not squarely held that a private right of action exists under Title VI, its recent decision in Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), supports our view. There the Court in deciding that a private right of action existed under Title IX, relied in part on its conclusion that Congress, when it drafted Title IX, used Title VI as a model and believed that Title VI provided a private right of action
 
 
 [20]
 Plaintiffs' reference was to Pub.L. 92-54, § 2, 85 Stat. 147 (1971), which states that "(i)t is the purpose of this Act to provide unemployed and underemployed persons with transitional employment in jobs providing needed public services during times of high unemployment "
 
 
 [21]
 It does not appear that the court relied in any way on the affidavit, since it made no finding as to the purpose of the City's receipt of federal funds
 
 
 [22]
 Section 706(g) provides:
 If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable. No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of (section 704(a) of the Act).
 The requirement that an employer have discriminated "intentionally" in order for the provisions of § 706(g) to come into play means not that there must have been a discriminatory purpose, but only that the acts must have been deliberate, not accidental. See Williams v. General Foods Corp., 492 F.2d 399, 406-07 (7th Cir. 1974), and cases cited therein. See also Franks v. Bowman Transp. Co., supra, 424 U.S. at 762-66, 770-71, 96 S.Ct. at 1263-1265, 1266-1267; Albemarle Paper Co. v. Moody, supra, 422 U.S. at 422-23, 95 S.Ct. at 2373-2374.
 
 
 [23]
 Those who can prove they were deterred from applying for employment by an employer's discriminatory practices are actual victims of discrimination and are entitled to the same restitution as minority applicants. See International Brotherhood of Teamsters v. United States, supra, 431 U.S. at 364-66, 97 S.Ct. at 1869-1870. The Court stated:
 The effects of and the injuries suffered from discriminatory employment practices are not always confined to those who were expressly denied a requested employment opportunity. A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection.
 If an employer should announce his policy of discrimination by a sign reading "Whites Only" on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs. The same message can be communicated to potential applicants more subtly but just as clearly by an employer's actual practices by his consistent discriminatory treatment of actual applicants, by the manner in which he publicizes vacancies, his recruitment techniques, his responses to casual or tentative inquiries, and even by the racial or ethnic composition of that part of his work force from which he has discriminatorily excluded minority groups.
 Id. at 365, 97 S.Ct. at 1870 (footnote omitted). Here, the district court found that the City had actively deterred interested minority candidates, a finding that is not clearly erroneous. Indeed, defendants merely content themselves with characterizing this finding as "dubious." Even were dubiety the standard, it would not be met in the face of the present record.
 
 
 [24]
 We find no merit in defendants' contention that the order will require the City to hire persons who are not qualified to be firefighters. All will be required to pass physical fitness tests, and meet the City's other requirements, other than the written test. As to the written test, its omission cannot be detrimental to the City. The district court found and defendants do not here dispute that these exams were not job related. Indeed, the Bridgeport Fire Chief testified that the 1975 exam might well rank lowest those candidates who would be the best firefighters. On the record in this case, therefore, it cannot be said that the minority applicants who failed the firefighters exams are any less qualified than the nonminority individuals who passed
 
 
 [25]
 Indeed, in these circumstances the order will have left uncompensated any additional actual victims of the City's discrimination, for as to any excess number the City is not required to offer firefighter positions or pay backpay
 
 
 [26]
 Although in Part B, infra, we conclude that the number 102 should be reduced, we use it here for convenience
 
 
 [27]
 All of the pertinent provisions of the order require that a list of 102 minority persons be compiled and that those persons be offered positions. See PP B(1), (2), (3), 479 F.Supp. at 115-17. If any of those persons declines the City's offer, there is no requirement that the City find a minority replacement whom it must actually hire
 
 
 [28]
 The deliberate failure to recruit minority applicants is particularly probative of a discriminatory policy where, as here, the minority employment is extremely low. Cf. International Brotherhood of Teamsters v. United States, supra, 431 U.S. at 365, 97 S.Ct. at 1870. See also Grant v. Bethlehem Steel Corp., 635 F.2d 1007, 1015 (2d Cir. 1980); Rogers v. International Paper Co., 510 F.2d 1340, 1345 (8th Cir.), vacated and remanded mem. on other grounds, 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975)
 
 
 [29]
 This ruling does not mean that relief was improperly extended to persons who were discriminated against in relation to the 1971 exam, since hiring on the basis of the results of that exam extended well into the period for which liability was properly found
 
 
 [30]
 In the first appeal in this case, our Court referred to the 41% figure as the percentage of minorities in the labor force, see ADE v. City of Bridgeport, supra, 594 F.2d at 308, but also quoted the district court's statement that minorities constituted 41% of the population, see id
 
 
 [31]
 Pursuant to Fed.R.Civ.P. 36, plaintiffs had asked the City to admit to the following:
 With respect to the "Affirmative Action Program, City of Bridgeport", published in March, 1976, herein marked Exhibit B:
 
 
 [14]
 Exhibit B is a true copy of the Affirmative Action Program prepared by the "Office of Contract Compliance" of the city of Bridgeport
 
 
 [15]
 On Page 26 is stated that "all data within this Program is based upon statistics as of October 1975"
 
 
 [16]
 On page 98 appears a table entitled "Characteristics of Labor Force Within the City of Bridgeport Proper"
 
 
 [17]
 The figures on the table on page 98 are accurate records of employment statistics by race and sex within the city of Bridgeport proper and are relevant to further statistical analysis for the purposes of this action
 
 
 [18]
 In 1975, black males constituted 13.1% of the Labor Force in the city of Bridgeport proper
 
 
 [19]
 In 1975, black females constituted 13.9% of the Labor Force in the city of Bridgeport proper
 
 
 [20]
 In 1975, white males constituted 28.3% of the Labor Force in the city of Bridgeport proper
 
 
 [21]
 In 1975, white females constituted 30.68% of the Labor Force in the city of Bridgeport proper
 
 
 [22]
 In 1975, hispanic males constituted 6.66% of the Labor Force in the city of Bridgeport proper
 
 
 [23]
 In 1975, hispanic females constituted 7.34% of the Labor Force in the city of Bridgeport proper
 On the morning the trial was to begin, the City filed a response that, while denying certain statements, expressly admitted all of these statements. The court, finding the City's response untimely, struck the entire response, leaving all of the facts set forth in plaintiffs' request, including those above, constructively admitted.
 
 
 [32]
 Plaintiffs contend that the percentage figures for minorities in the population and the labor force are closely similar
 
 
 [33]
 We also therefore modify the number of persons to whom backpay may be awarded, reducing that number to a maximum of 73
 
 
 [34]
 Presumably, the City can be expected to offer positions first to those who were the victims of discrimination, in order to limit its backpay obligations. This would also have the effect of minimizing the delay in promotional eligibility
 
 
 [35]
 See note 33 supra. The number set is a maximum which in fact may not be reached because the district court, properly, awarded backpay only to minority persons who could prove either that they applied to take the 1971 or 1975 exam or that they were deterred from so applying by the City's discriminatory practices