Horace E. RHODES, et al., Plaintiffs,

v.

CITY OF WICHITA, Kansas, et al., Defendants.

Civ. No. 77–1488.

United States District Court, D. Kansas.

June 8, 1981.

James S. Phillips, Jr., Wichita, Kan., for plaintiffs.

John Dekker, City Atty., S. A. Issinghoff, Asst. City. Atty., H. E. Jones, Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER

KELLY, District Judge.

This case was brought against the City of Wichita and two of its police officers on behalf of Horace and Stanley Rhodes, two minors who were twelve and eleven years old at the time of the incidents complained of. The events in question began when five policemen were dispatched to investigate a suspected burglary in progress at a house that was owned by plaintiffs' father. Under plaintiffs' version of the facts, which the Court assumes to be true for the purpose of the motion before it, the officers, guns drawn, entered the house through the open front door and encountered plaintiffs, who were cleaning the empty house at their father's direction. One child was found in a front room where he had just turned on a jukebox; the other child emerged from a rear room, carrying a mop. Plaintiffs claim that they were threatened by the defendant officers, beaten by them, arrested for "resisting arrest," manacled, taken to the Wichita City Building, held for several hours, and finally released to their parents without charges being filed. They explicitly contend that the initial entry into the house was "without legal cause or justification." Plaintiffs claim to have suffered both physical and emotional actual damages and seek substantial punitive damages as well.

Plaintiffs have abandoned those aspects of their claims grounded in alleged race discrimination and no longer seek to reach the City under 42 U.S.C. § 1983. It thus remains for this Court to determine whether the claims against the individual officers

are sufficient under Section 1983 and to determine whether a claim for damages may be brought against the City directly under the Fourth and Fourteenth Amendments. As discussed more fully below, the Court finds that each of these claims is good and that it must therefore deny defendants' motions for summary judgment.

The Section 1983 claims against the officers are most easily dealt with. The Court does not dispute defendants' contentions that a mere common law tort does not rise to the level of a constitutional violation simply because it is committed by a government employee, a point sufficiently demonstrated by *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) and *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). But, by the same token, a constitutional violation does not lose that status merely because it might also be actionable under state tort law. It is a "basic principle" of the Fourth Amendment that warrantless entry into a home is "presumptively unreasonable," *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980), unless that entry "falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances,'" *Coolidge v. New Hampshire*, 403 U.S. 443, 474–75, 91 S.Ct. 2022, 2042–43, 29 L.Ed.2d 564 (1971), and the Court does not understand defendants to claim that any exigent circumstances were present here. Inasmuch as the search and seizure alleged here are *inherently* at odds with Fourth Amendment principles made applicable to state action by the Fourteenth Amendment, see *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), the Court is *not* faced, as defendants would have it, with an otherwise legitimate arrest executed in an overzealous manner, as in *Wells v. Ward*, 470 F.2d 1185 (10th Cir. 1972).

Plaintiffs' claims against the City present a much closer question. They argue that, by analogy to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), they are entitled to bring an action against the City directly under the Fourth and Fourteenth Amendments; they further contend that the traditional common law doctrine of *respondeat superior*, under which a master is liable for his servant's torts, is applicable in such an action. This Court agrees. While it cannot be denied that those Courts of Appeal which have considered the issue have come to the opposite conclusion, see *Dean v. Gladney*, 621 F.2d 1331 (5th Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 1521, 67 L.Ed.2d 819 (1981); *Cale v. City of Covington*, 586 F.2d 311 (4th Cir. 1978); *Jones v. City of Memphis*, 586 F.2d 622 (6th Cir. 1978), *cert. denied* 440 U.S. 914, 99 S.Ct. 1230, 59 L.Ed.2d 464 (1979); *Molina v. Richardson*, 578 F.2d 846 (9th Cir.), *cert. denied* 439 U.S. 1048, 99 S.Ct. 724, 58 L.Ed.2d 707 (1978); *Turpin v. Mailet*, 579 F.2d 152 (2nd Cir.) (en banc), *vacated and remanded sub nom. City of West Haven v. Turpin*, 439 U.S. 974, 99 S.Ct. 554, 58 L.Ed.2d 645 (1978); *Nix v. Sweeney*, 573 F.2d 998 (8th Cir. 1978); *Jamison v. McCurrie*, 565 F.2d 483 (7th Cir. 1977); *Kostka v. Hogg*, 560 F.2d 37 (1st Cir. 1977); *but cf. Dellums v. Powell*, 566 F.2d 216 (D.C.Cir.1977), *cert. denied* 438 U.S. 916, 98 S.Ct. 3147, 57 L.Ed.2d 1161 (1978) (District of Columbia held vicariously liable in *Bivens* action for acts of police chief), this Court believes that a proper reading of *Bivens*, especially as illuminated in its progeny, *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) and *Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), not only supports but compels the decision reached here.

The *Bivens* holding was premised on the twin principles that a person whose constitutional rights have been infringed has a personal *right* to a remedy, and that the "ordinary remedy for an invasion of personal interests in liberty" lies in a suit for damages. See 403 U.S. at 395–97, 91 S.Ct. at 2004–05; *id.* at 407–09, 91 S.Ct. at 2010–11 (Harlan, J. concurring). *Bivens* is inappropriately read as a case of judicial legislation within the interstices unjustly and inadvertently left by Congress: it represents,

rather, "an explicit recognition that the constitutional guarantee embraces a right of action." Monaghan, *The Supreme Court, 1974 Term—Foreward: Constitutional Common Law*, 89 Harv.L.Rev. 1, 24 n. 125 (1975). Justice Brennan's opinion for the *Bivens* majority labels a Fourth Amendment claim as "both necessary and sufficient to make out the plaintiff's cause of action," 403 U.S. at 395, 91 S.Ct. at 2004 (citation omitted), while Justice Harlan, in his concurring opinion, explained that "a court of law vested with jurisdiction over the subject matter of a suit has the power— *and therefore the duty*—to make principled choices among traditional judicial remedies." 403 U.S. at 408 n. 8, 91 S.Ct. at 2011 n. 8 (emphasis added).[1]

It is scarcely a daring argument to contend that these principles extend to the case at bar. Justice Brennan's opinion for the *Bivens* majority does, of course, allude to two situations in which the second[2] *Bivens* principle might not carry the day; where "special factors counseling hesitation in the absence of affirmative action by Congress" were involved, *id.* 403 U.S. at 396, 91 S.Ct. at 2005; or where there was an "explicit congressional declaration" that the aggrieved individual be "remitted to another remedy, equally effective in the view of Congress," *id.* 403 U.S. at 397, 91 S.Ct. at 2005. This Court believes, however, that subsequent Supreme Court decisions teach us that neither of these countervailing situations obtain in the case *sub judice*.

In *Davis v. Passman, supra,* the Court held that a woman who was fired from her job in a congressman's office had a right, under the equal protection component of the Fifth Amendment Due Process Clause, to bring a damage action against the congressman for sex discrimination. The *Davis* majority rejected the argument that an action for damages was foreclosed because Congress had deliberately excepted itself from Title VII of the Civil Rights Act of 1964, which broadly prohibits sex discrimination in employment: it declared that "[t]here is no evidence . . . that Congress meant . . . to foreclose alternative remedies available to those not covered by the statute" and added that "silence is far from 'the clearly discernible will of Congress.'" 442 U.S. at 247, 99 S.Ct. at 2278. Similarly, in *Carlson v. Green, supra,* the Court held that a damage action brought under the Eighth Amendment against federal prison officials could proceed notwithstanding Congress' post-*Bivens* amendment to the Federal Tort Claims Act which, for the first time, extended that Act's remedies to intentional torts committed by federal law enforcement officers. The *Carlson* decision was not merely predicated on the fact that the Court has referred to "nothing in the Federal Tort Claims Act (FTCA) or its legislative history to show that Congress

---

1. In the quoted passage Justice Harlan was speaking of both statutory and constitutional causes of action. While his approach is no longer followed with regard to implied statutory causes of action, *compare J. I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) *with Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), there is an important difference between statutory rights and constitutional ones. As explained in *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), the former "are established by Congress, and it is entirely appropriate for Congress, in creating these rights . . . to determine in addition who may enforce them and in what manner. . . . The Constitution, on the other hand, does not 'partake of the prolixity of a legal code.' . . . At least in the absence of 'a textually demonstrable *constitutional commitment* of [an] issue to a coordinate political department, . . . we presume that justiciable constitutional rights are to be enforced through

the courts. And, unless such rights are to become merely precatory, the class of litigants who allege that their own constitutional rights have been violated . . . must be able to invoke the existing jurisdiction of the courts for the protection of their justiciable constitutional rights." *Id.* at 241–42, 99 S.Ct. at 2274–75 (citations deleted and emphasis added).

2. In mentioning "special factors" and an "explicit congressional declaration," Justice Brennan is speaking *only* to the appropriateness of a damages remedy. These passages are set out under the heading "*Third*," immediately after Justice Brennan finishes his discussion under the heading "*Second*," by concluding that a Fourth Amendment claim is both necessary and sufficient to make out the plaintiff's cause of action. *See* 403 U.S. at 394–97, 91 S.Ct. at 2003–05.

meant to preempt a *Bivens* remedy or to create an equally effective remedy for constitutional violations." 446 U.S. at 19, 100 S.Ct. at 1472, 64 L.Ed.2d at 24. The Court was also influenced by its view that "the *Bivens* remedy is more effective than the FTCA remedy." *Id.* at 20, 100 S.Ct. at 1473, 64 L.Ed.2d at 25.

The only possible alternate federal remedy to the direct action under the Fourteenth Amendment is, of course, that provided by 42 U.S.C. § 1983. But whatever may be said of the Supreme Court's determination that Congress, in enacting Section 1983, did not intend to subject municipalities to liability solely on a *respondeat superior* theory—a determination that has not gone uncriticized, *see, e. g.,* Note 44 Mo.L. Rev. 514 (1979)—Congress simply cannot be said to have made an "explicit declaration" on the subject. As Judge Grant declared in his dissent in *Molina v. Richardson, supra,* "it would be an unwise use of judicial power, and inconsistent with the principles of clear statement, to extrapolate from the tarnished analysis of ambiguous ... language ... and conclude that Congress has explicitly determined to preempt the field of municipal liability when the result seriously restricts the remedies available to a court in constitutional adjudication." 578 F.2d at 855.

More important, since Section 1983 originated as Section 1 of the Ku Klux Act of 1871, which included a grant of original jurisdiction to the lower federal courts that antedated the general federal question jurisdiction first granted in 1875, it would be difficult to determine from the congressional debates whether any limitation on Section 1 was intended as a substantive limitation, or as a jurisdictional one. Indeed, several of the participants in the 1871 congressional debates seemed to assume that the Fourteenth Amendment was already enforceable in state courts, and objected to it merely because of its expansion of federal court jurisdiction. Senator Thurman, a for-

mer Chief Justice of the Ohio Supreme Court, and the chief opponent of Section 1, declared that:

> It creates no new cause of action. Its whole effect is to give to the Federal Judiciary that which now does not belong to it—a jurisdiction that may be constitutionally conferred upon it, I grant, but that has never yet been conferred upon it. It authorizes any person who is deprived of any right, privilege, or immunity secured to him by the Constitution of the United States, to bring an action against the wrong-doer in the Federal courts, and that without any limit whatsoever as to the amount in controversy. The deprivation may be of the slightest conceivable character, the *damages* ... may not be five dollars or even five cents; ... and yet by this section jurisdiction of that civil action is given to the Federal courts instead of its being prosecuted *as now* in the courts of the States.... This bill embraces the whole United States; and to say that every man who may be injured, however slightly, in his rights, privileges, or immunities as a citizen of the United States can go to the Federal courts for redress is to say, in effect, that the judiciary of the States is not worthy of being trusted. I for one am unwilling to say that. (Cong. Globe, 42d Cong., 1st Sess., app. 216 (1871). (Emphasis added).

Similarly, Senator Morgan, after quoting the now familiar second sentence of the first section of the Fourteenth Amendment[3] asked: "Is there any power conferred there, unless it be to go into the courts for redress against a violation of these rights?" Cong. Globe, 42d Cong., 1st Sess. (1871), *reprinted in* 1 B. Schwartz, Statutory History of the United States: Civil Rights 608 (1970).

None of Section 1's proponents disputed the contention that it was merely a jurisdictional grant, and that the Fourteenth Amendment was, at least theoretically, en-

---

**3.** No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or

property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

forceable in state courts. They questioned, rather, whether the state courts were willing or able to enforce the constitutional provisions. *See, e. g.,* Cong. Globe, 42d Cong., 1st Sess. 374–76 (1871) (remarks of Representative Lowe); *id.* at 653 (remarks of Senator Osborn); *id.* at app. 68–69 (remarks of Representative Shellabarger); *id.* at app. 85 (remarks of Representative Bingham). It appears, therefore, that the members of the 1871 Congress, most of whom were members of the Congress that originated the Fourteenth Amendment, assumed that a cause of action was inherent in the Constitution itself. *Cf. California v. Sierra Club,* — U.S. —, — & nn. 2–3, 101 S.Ct. 1775, 1782 & nn. 2–3, 68 L.Ed.2d 101 (1981) (Stevens, J., concurring) (in 1890, "implication of private causes of action was a well-known practice at common law and in American courts").

This is not to suggest that what is now codified as 42 U.S.C. § 1983 does not to some extent reflect a congressional policy of limiting the damage liability of municipalities. At the same time, however, it cannot be gainsaid that Title VII even more clearly reflects a congressional policy of limiting the liability of congressmen for acts of employment discrimination; nor can it be denied that the FTCA reflects a congressional policy of confining federal tort liability to the ambit of state tort law. If *Davis* and *Carlson* teach anything, it is that a mere policy judgment by Congress does not outweigh the individual's right to a remedy when his constitutional rights have been violated.

*Davis* and *Carlson* also flesh out *Bivens'* allusion to "special factors counseling hesitation." *Carlson* informs us that hesitation is warranted if the defendant "enjoy[s] such an independent status in our constitutional scheme as to suggest that judicially created

remedies against [him] might be inappropriate," 446 U.S. at 19, 100 S.Ct. at 1472, 64 L.Ed.2d at 24, while *Davis* provides an example of such a defendant: a congressman, 442 U.S. at 246, 99 S.Ct. at 2277. These cases also make it clear, however, that such hesitation need not go beyond an invocation of explicit constitutional immunities—such as provided to congressmen by the Speech or Debate Clause, Art. I, § 6, cl. 1—or of the qualified immunity accorded officials by *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). See 446 U.S. at 19, 100 S.Ct. at 1472, 64 L.Ed.2d at 24; 442 U.S. at 246, 99 S.Ct. at 2277. To be sure, municipalities may well enjoy a certain independent constitutional status reflected in the Tenth Amendment, *see National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976); it cannot be contended, however, that the Tenth Amendment somehow exempts cities from the Fourteenth Amendment: *Monell* alone is sufficient proof of this. *See also Turpin v. Mailet, supra,* 579 F.2d at 160. It is also clear that a municipality shares neither the Eleventh Amendment immunity of a state, *Mt. Healthy School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), nor the common law qualified immunity of its officials, *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

Justice Harlan's concurring opinion in *Bivens* also indicates that a court's choice of remedies when faced with a constitutional cause of action is not unlimited; he observed that certain invasions of constitutionally-protected interests might present difficult questions of valuation or causation, 403 U.S. at 408–09 & n. 9, 91 S.Ct. at 2010–11 & n. 9, which might render a damages award inappropriate.[4] But it is crystal

---

4. Justice Harlan referred to a passage in his *Monroe v. Pape* opinion in which he noted that "[t]here may be no damage remedy for the loss of voting rights or for the harm from psychological coercion leading to a confession. And what is the dollar value of the right to go to unsegregated schools?" 365 U.S. 167, 196 n. 5, 81 S.Ct. 473, 489 n. 5, 5 L.Ed.2d 492 (1961) (concurring in the judgment). *Cf. Carey v.*

*Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (in absence of proof of actual damages, students whose suspension from school contravened due process requirements entitled only to nominal damages, not to exceed one dollar). For an example of a case presenting causation problems, *see Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980) (death of person killed by parolee too

clear that in the present case, as in *Bivens* itself, "the experience of judges in dealing with private trespass and false imprisonment claims supports the conclusion that courts at law are capable of making the types of judgment concerning causation and magnitude of injury necessary to accord meaningful compensation for invasion of Fourth Amendment rights." *Id.* at 409, 91 S.Ct. at 2011. Justice Harlan further indicated that his understanding of the propriety of "implying" a remedy extended only "to a process whereby the federal judiciary exercises a choice among *traditionally available* judicial remedies," 403 U.S. at 402, n. 4, 91 S.Ct. at 2008, n. 4 (emphasis original). *See also id.* at 408, n. 8, 91 S.Ct. at 2010, n. 8. There is scarcely a remedy more traditional, however, than is expressed when the master is held vicariously liable for the torts of his servant. See W. Prosser, Handbook of the Law of Torts § 69 (4th ed. 1971). It is worth noting that while Chief Justice Burger did not believe that the decision in *Bivens* was correct, he commended to Congress and to the state legislatures the creation of statutory vicarious liability of government units for police misconduct and declared that "[t]he venerable doctrine of respondeat superior in our tort law provides an entirely appropriate conceptual basis" for such a remedy. See 403 U.S. at 422, 91 S.Ct. at 2017 (Burger, C. J., dissenting). *Cf. Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970) (National chain of retail stores vicariously liable under 42 U.S.C. § 1983 for acts of lunch counter waitress within scope of employment).[5]

Not only does the remedy sought by plaintiffs fall within the ambit of the principles that gave life to *Bivens* : to allow a person whose Fourth Amendment rights have been violated by a city's policemen to subject that city to vicarious liability serves additional principles and policies of undoubted importance. First and foremost, it provides the innocent wronged one with a much more realistic opportunity to be made whole for the harm done him. Unlike the police officers who act on its behalf and for its benefit, the city itself will not be entitled to any good faith immunity, *compare Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) *with Pierson v. Ray*, 386 U.S. 547, 555–57, 87 S.Ct. 1213, 1218–19, 18 L.Ed.2d 288 (1967);[6] nor will the city benefit from the same degree of jury sympathy as do its men in blue;[7] and, of course, a city is much less likely to be judgment proof than is a policeman.

Second, it is likely that the cause of action sought by plaintiffs will deter future wrongdoing in a way that alternatives would not. As Professor Davis has cogently argued:

> For police abuses inflicted on those suspected of crime, the best cure is neither the awkward and unsatisfactory exclusionary rule ... nor theoretical liability of officers in tort. The most promising way to correct the abuses ... is to provide incentives to top officials, by imposing liability on the governmental unit. The top officials, motivated by threats to

---

remote a consequence of parole board's decision to be actionable under 42 U.S.C. § 1983).

**5.** While Justice Harlan probably had the exclusionary rule of *Mapp v. Ohio* in mind as an example of a nontraditional "special prophylactic measure" not within the scope of the *Bivens* decision, *see* 403 U.S. at 408 n. 8, 91 S.Ct. at 2011 n. 8, other examples can be cited. For example, at common law, a supervisory employee would not be vicariously liable for the torts of his subordinates, since he is a fellow servant rather than a master. Of course, such liability without fault would also contravene the policy underpinnings of the supervisory official's good faith immunity. *Cf. Kite v. Kelley*,

546 F.2d 334 (10th Cir. 1976) (Superiors of FBI agents not vicariously liable in *Bivens* action).

**6.** One assumes that the immunity rules are the same in actions brought directly under the Constitution as in actions brought under 42 U.S.C. § 1983. *See Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).

**7.** The Court of Appeals for the Ninth Circuit has described the notion of jury sympathy for policemen as "speculative at best." *Molina, supra*, 578 F.2d at 853. For a convincing *empirical* demonstration to the contrary, *see generally* Project, *Suing the Police in Federal Court*, 88 Yale L.J. 781 (1979).

their budgets, would issue the orders that would be necessary to check the abuses in order to avoid having to pay damages. Policemen, as experience proves, are largely indifferent to theoretical personal liability, which is sporadically imposed and which typically lags years behind the abuse. But policemen, like any other employees, do respond to rules enforced by their superiors, for the enforcement may be steady, swift, and sure, and the penalties, including suspension or dismissal, provide fully effective motivation.

K. Davis, Administrative Law Treatise, § 25.17, at 864 (Supp.1970).

Third, if the city may be held vicariously liable, troublesome attempts to hold the city directly liable will be obviated. There are a number of evident tactical reasons why a plaintiff who complains of police misconduct would wish to join the city as a named defendant, and if such a plaintiff is relegated to a Section 1983 cause of action, he is likely to attempt to ferret out sufficiently numerous incidents to establish a "custom" of misconduct, or to establish that policemen are inadequately trained or supervised, or that wrongdoers' acts are ratified through consistent failure to discipline, and so on. *Cf. McClelland v. Facteau*, 610 F.2d 693 (10th Cir. 1979); *Turpin v. Mailet*, 591 F.2d 426 (2nd Cir. 1979) (en banc) (on remand). As one exasperated judge has noted, the result is that Section 1983 suits arising out of a single instance of police misconduct risk placing the entire police department on trial and may well involve sweeping discovery, protracted trial, and large attorneys' fees, *see Smith v. Ambrogio*, 456 F.Supp. 1130, 1137 (D.Conn.1978). In distinct contrast, if municipal liability may be predicated on traditional *respondeat superior* doctrine, the lawsuit is likely to be limited to the simple determination of what happened on one specific occasion and will thus be less burdensome to the city, its police department, and the court that hears the suit, because the injured party will not have to mount a crusade to gain access to a deep pocket or overcome a policeman's qualified immunity. Moreover, if the city is found vicariously rather than directly liable,

prospective injunctive relief will not be warranted, *see Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), and judicial interference with internal police department affairs will not take place.

When one looks behind ritualistic incantations of "federalism" and "separation of powers," it can be seen that the principles and policies discussed above are counterbalanced by a single notion: the importance of preserving the municipal fisc. The Court has already noted that this interest may occasionally grow to constitutional dimensions, *see National League of Cities, supra,* but it remains stunted when in the shadow of the Fourteenth Amendment. An individual policeman encounters only a limited number of citizens each day: a mayor or police chief can set a policy that, unintentionally and despite the utmost in good faith, potentially violates the constitutional rights of thousands, or even millions; indeed, even when municipal officials act *ad hoc*, they may subject their city to large damages. *See, e. g., Miller v. City of Mission,* No. 77–2259 (D.Kan. Apr. 7, 1981) (police captain dismissed in violation of due process guarantees awarded $287,395 by jury); *cf. Owen v. City of Independence, supra.* In the overwhelming majority of states, municipalities are held liable for the ordinary torts of their employees, *see* 63 C.J.S. Municipal Corporations § 746: a city truck driver can, by a moment's inattention to the road, subject his master to a liability greater than could realistically be expected in a lifetime's worth of police brutality cases. Under federal law of employment discrimination, a municipality may be subjected to a large back pay award because it has used an employment test that selects too few women or minorities for employment, *see, e. g., Association Against Discrimination in Employment, Inc. v. City of Bridgeport,* 647 F.2d 256, 25 FEP Cases 1013 (2d Cir. 1981); *United States v. City of Buffalo,* 633 F.2d 643 (2d Cir. 1980), even though it has not violated the Constitution because it has not acted with intent to discriminate, *see Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597

**508**

(1976). Examples such as these could be repeated almost endlessly. To forbid the remedy sought by plaintiff solely in the name of municipal fiscal integrity is to exhibit something akin to an irrational devotion to the few drops of bath water that remain after the baby has vanished down the drain.

The right to be free of unreasonable searches and seizures is so fundamental and important that it is enshrined in the Fourth Amendment to the Constitution and enforced against the states through the Fourteenth Amendment. *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). Because it is so paramount a right, it finds expression in the exclusionary rules of *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914) and *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), whose inevitable and well-recognized consequence is the freeing of some criminals who would otherwise be convicted. To say that Fourth Amendment rights are so important that a community must accept a certain number of unpunishable felons roaming its streets, and yet insufficiently important to justify any risk to the municipal coffers, would be to make a value judgment of almost unbelievable perversity, in which this Court cannot join. It would be grossly inequitable if Fourth Amendment rights were more than precatory only to those being tried on criminal charges.

Thus, to the extent that they are not mooted by plaintiffs' abandonment of certain claims, defendants' motions for summary judgment are in all respects denied.